## UNITED STATES v. MOTOR FREIGHT EXPRESS.

### No. 2142–C.

District Court, D. New Jersey.

April 7, 1945.

B. Thorn Lord, U. S. Atty., and Edgar H. Rossbach, Asst. U. S. Atty., both of Newark, N. J., for plaintiff.

A. B. Campbell, of Washington, D. C., for Interstate Commerce Commission.

Albert B. Kahn, of Trenton, N. J., (Charles E. Cotterill, of New York City, of counsel), of defendant.

FORMAN, District Judge.

The government filed a criminal information against defendant consisting of 20 counts, each representing a different delivery made by defendant between January 20, 1943 and June 12, 1943, and each charging that with respect to each delivery defendant engaged in the transportation of property for the general public in interstate commerce by motor vehicle on public highways from Hanover, Pennsylvania, to Beverly, New Jersey, without a certificate of public convenience and necessity authorizing such operations, as required by Part II of the Interstate Commerce Act of 1935, as amended, § 206(a), relating to Motor Carriers, 49 U.S.C.A. § 306 (a).

Defendant entered a plea of not guilty to the information and the issue came to trial without a jury.

Defendant is a common carrier by motor vehicle engaged in the transportation of property for compensation in interstate commerce. It received, transported and delivered the merchandise described in this information as stated therein. Its operations in interstate commerce are authorized by a certificate of public convenience and necessity issued to it by the Interstate Commerce Commission, which permits it to serve numerous localities, among them Hanover and Philadelphia in Pennsylvania. The incorporated community of Beverly, New Jersey, having a population of 2,691 in 1940, is located two and three-quarter miles from the nearest part of the city of Philadelphia as reckoned from the edge of the channel of the Delaware River at Poquessing and the channel of the river at that place is approximately one-quarter of a mile from the shore line in the City of Philadelphia.

The facts set forth above are not in dispute and are substantially as they appear in a stipulation signed by the representatives of the government and the defendant.

After introducing the formal stipulation into evidence the government rested.

The defendant offered testimony to show that the Baltimore Transfer Company was incorporated in the State of Maryland in 1892 and its stock is now held by the Pennsylvania Railroad Company and another corporation. In 1929 its officers organized the defendant company in the State of Pennsylvania. The Baltimore Transfer Company owns all of the stock of the defendant. It was incorporated in Pennsylvania because of a requirement of that state that a corporation could not hold an intrastate franchise unless it was chartered therein. The managerial control of both the Baltimore Transfer Company and the defendant was in the hands of their mutual president. Both companies have almost identical officers and directorates. Each of the corporations applied for and received separate "grandfather" rights.

The Baltimore Transfer Company has a certificate of public convenience and necessity to make shipments, among other places, from Baltimore to Philadelphia, and places within 5 miles of Philadelphia. The certificate of public convenience and necessity held by the defendant authorized it to make shipments, among other places, from Hanover, Pennsylvania, to Philadelphia.

The Baltimore Transfer Company owns, maintains and operates a terminal in Baltimore and the defendant owns, maintains and operates a terminal in Philadelphia. The defendant has title to 88 trailers and 68 tractors, while the Baltimore Transfer Company has 100 trailers and 72 tractors in its name. There is a daily interchange of trailers and an occasional interchange

of tractors between the companies. Solicitation of accounts is carried on by the same solicitor for both companies.

The freight moved on the lines of the defendant or the Baltimore Transfer Company, according to the territorial rights of the respective companies notwithstanding the issuance of a bill of lading in the name of one or the other of the companies. A charge of 12½ cents per 100 pounds of freight regardless of quantity was set up by defendant in its books against the Baltimore Transfer Company when a shipment in less than truckload lot was transported by the Baltimore Transfer Company to Philadelphia or picked up by the defendant and delivered to the consignee by it. The Baltimore Transfer Company reversed this procedure and set up a charge against the defendant at the same rate for deliveries in the Baltimore terminal area. Detailed entries were made in the books of both companies to cover charges against them respectively for maintenance of equipment.

It was conceded by the defendant that in the instances of the particular deliveries from Hanover, Pennsylvania, to Beverly, New Jersey, named in the information filed herein, it did not set up charges against the Baltimore Transfer Company for the deliveries from Philadelphia to Beverly, New Jersey. Local union regulations required a change of drivers at the Philadelphia terminal before deliveries were made on inborn freight moving in solid truckload shipments. Application was filed by the defendant to the Interstate Commerce Commission to extend its authorized service to places within 5 miles of Philadelphia on August 14, 1943. This was prior to the filing of the information herein (November 15, 1943), but subsequent to the alleged violations herein (January 20, 1943 to June 12, 1943).

The defendant took the position—

(1) That the collection and delivery of property by it at Beverly, New Jersey, and other places contiguous to the corporate limits of Philadelphia is only a "terminal service" and not the kind of operation requiring description in a certificate of public convenience and necessity;

(2) That although the Interstate Commerce Commission, by general or special order directed to the subject, might define and limit the territory of a motor carrier's "terminal area" embracing outlying suburban communities around a large metropolitan center, it had not chosen to do so in the case of this defendant and the court may not interpose its judgment as to how far beyond the corporate limits of a large municipality a motor carrier may perform "collection and delivery terminal service" before it becomes a road haul intercity operation requiring description in a certificate of public convenience and necessity;

(3) That the Bureau of Motor Carriers of the Interstate Commerce Commission has recognized that a "grandfather" certificate reading "Philadelphia" carries with it the statutory right to make terminal collections and delivery to *some* territory beyond the municipal limits, although without authority that Bureau has additionally sought in its interpretative bulletin to interpose this idea as to limitations notwithstanding the absence of official administrative determination by the Interstate Commerce Commission;

(4) That the filing of the information herein was premature because the Interstate Commerce Commission was in process of considering and determining the extent to which the defendant was entitled to serve this area;

(5) That the Baltimore Transfer Company is entitled, by its certificate, to perform terminal collection and delivery operations within a zone of 5 miles of the Philadelphia municipal boundary and the defendant is merely an "operating department" of the former company. The mere omission to make bookkeeping entries by the defendant of the transactions alleged in the information charging its parent company and giving credit to itself, was, in law, trivial, and goes to mere "method" but that it cannot convert otherwise honest business conduct into criminal offenses;

(6) That the statute and the Commission's regulations thereunder are so indefinite and lacking in reasonable certainty that enforcement thereof in this case deprives defendant of its protection under the Fifth Amendment of the Constitution of the United States.

Let us consider defendant's first contention that the shipments recited in the information constituted a "terminal service" operation, or a pickup and delivery service within a terminal area, which does not require a certificate of public convenience and necessity. It seeks to distinguish these shipments from that which is known as "line-haul service" or "inter-

city" operation, which service or operation requires authorization from the Interstate Commerce Commission. This contention is grounded upon the following cases and provisions of the Interstate Commerce Act, supra:

In New York Dock Ry. v. Pennsylvania R. Co., 3 Cir., 62 F.2d 1010, certiorari denied 289 U.S. 750, 53 S.Ct. 694, 77 L.Ed. 1495, suit was brought by common carriers and others to enjoin the railroad from establishing a store door receipt and delivery service in New York City without first obtaining a certificate from the Interstate Commerce Commission. The complainants sought a decree on the theory that this was an extension of line which is unlawful without a certificate of public convenience and necessity. The court found in favor of the railroad that New York City was within its terminal area for which the improvements and extension of service required no certificate and distinguished an extension of line contemplated under Part I, Section 1, paragraph 18 of the Interstate Commerce Act, 49 U.S.C.A. § 1 (18), as "an extension of a railroad line, the thing itself" i. e. the tracks, etc., "not an extension of a transportation service in connection with an established railroad" (62 F.2d at page 1013), which were found to be the facts in the case. Defendant recognizes that this case was decided two years before Part II of the Act, supra, was enacted and points to the cases of Merchant Truckmen's Bureau v. United States, D. C., 16 F.Supp. 998, and American Trucking Ass'ns v. United States, D. C., 17 F. Supp. 655, decided subsequent to said Part II, to show that the same distinctions exist after its passage.

In the former case in an application by the Merchant Truckmen's Bureau of New York for an interlocutory injunction against the United States and others, an order of the Interstate Commerce Commission was attacked for allowing a railroad to file rate schedules for pickup and delivery service on the theory that the railroad could not engage in such service without certificates of convenience and necessity as required by § 206(a) of the Motor Carrier Act of 1935, as amended, supra. The court upheld the Commission in the following language:

"The Commission held, and we think rightly, that by reason of the definition in section 203(a) (14) of the act (49 U.S.C.A. § 303(a) (14) the requirement that such certificates be secured is not applicable to the service in question." Merchant Truckmen's Bureau v. United States, D. C., 16 F.Supp. 998 at page 1000.

In the latter case, a suit in equity by the American Trucking Association, Inc., against the United States and others to set aside and declare of no effect two orders of the Interstate Commerce Commission respecting tariffs filed by railroads for a pickup and delivery service, plaintiff moved for an interlocutory injunction to enjoin the railroads pendente lite either from acting under the orders aforesaid or under their respective tariff schedules without first obtaining a certificate of public convenience and necessity as required by Part II of the Interstate Commerce Act, supra. A three judge court denied the motion for an interlocutory injunction and expressed the opinion that neither § 206(a)[1] nor § 203(a) (14)[2] of Part II of the Interstate Commerce Act, supra, could be applied to the character of the service rendered by the railroads which was sought to be enjoined. The court supported its conclusion in the following language:

"As we have pointed out, the Commission over a period of many years, indeed since 1912, has held that railroad operation of pick-up and delivery service by motor-

---

[1] "Except as otherwise provided in this section and in section 310a, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operation on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: * * *." 49 U.S. C.A. § 306(a).

[2] "(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to chapter 1 of this title, to which extent such transportation shall continue to be considered to be and shall be regulated as transportation subject to chapter 1 of this title." 49 U.S.C.A. § 303 (a) (14).

truck is a transportation service subject to the jurisdiction of the Commission under the provisions of the Interstate Commerce Law now known as part 1 of that act (49 U.S.C.A. § 1 et seq.). We think this has also been the holding of the courts in those cases in which the question has arisen. [N. Y. Dock Ry. v. P. R. R. Co. (D.C.) supra, [1 F.Supp. 20] is cited at this point.] We are, therefore, in full agreement with the statement of the Commission that in adding the proviso in section 203(a) (14)— except to the extent that these operations are subject to the provisions of part 1— 'Congress may be presumed to have legislated with knowledge of the court decisions previously mentioned, holding that pick-up and delivery service is within the meaning of "transportation" as defined in section 1(3) of the Interstate Commerce Act (49 U.S.C.A. § 1(3) ) as well as with knowledge of our own administrative findings to the effect that while railroad terminal service by motortruck was subject to regulation under the Interstate Commerce Act, the use of motortrucks by railroads in line-haul service was not subject to that act.' And therefore we think that in the exception Congress intended to include under the provisions of part 2 intercity motor vehicle operations of railroads but at the same time to exclude, from that part, motor vehicle operations within terminal districts." American Trucking Ass'ns v. United States, D. C., 17 F.Supp. 655, at pages 657, 658.

At a later point in its opinion the following statements were made:

"As we have seen, the Commission has repeatedly held that, under the provisions of the original Interstate Commerce Act (part 1), it has jurisdiction over railroad operation of terminal motortruck services as constituting terminal facilities within the meaning of section 1(3) of the act, but that it had no jurisdiction of line-haul motortruck operation by railroads—because the same did not constitute terminal facilities. [Cases cited at this point.] It is therefore perfectly plain that at the passage of the act of 1935 Congress had notice that there were two kinds of railroad motor vehicle operations: One, in terminal districts as a part of the service of transportation; and the other, in what is commonly known as line-haul or over the road service, that is to say, from one city or town to another. As to the first, the Commission had consistently asserted jurisdiction under the provisions of the original Interstate Commerce Act, but, as to the second, it had held that the use of motortrucks in line-haul or over the road service was not subject to its jurisdiction. In these circumstances the unmistakable purpose of Congress, as we think, in the use of the language in section 203(a) (14) was to supply the missing jurisdiction as to motor line-haul service by railroads, and to require in such cases a certificate of public convenience and necessity—but to do no more. The reason for this is plain when it is considered that for many years the terminal service had been held a part of the transportation service of the carriers as to which jurisdiction was complete; whereas intercity service was a wholly new adventure. In this view we are of opinion that the correct interpretation of section 203(a) (14) is that every interstate common carrier by motor vehicle, including carriers by rail or water, shall first obtain a certificate of public convenience and necessity—except to the extent that such motor vehicle transportation was then subject to the jurisdiction of the Commission under the original act. This interpretation finds support in the legislative history of the more recent act for, as is pointed out by the Commission in its opinion, Senator Wheeler, chairman of the committee having the bill in charge, said in explanation of the particular clause we are discussing: 'The term "common carrier by motor vehicle" includes both regular and irregular route operators and embraces the motor vehicle operations of rail, water, express, and forwarding companies except to the extent that these operations are subject to the provisions of Part 1'. 79 Cong.Record, 5651." 17 F.Supp. 655, at page 658.

We have nothing further to add to the findings of the court in American Trucking Ass'ns v. United States, supra, as to the applicable sections of the Interstate Commerce Act, and the intent of Congress with respect to them. If the shipments to Beverly, New Jersey, were part of a terminal service operation involving pick-up and delivery service, and if Beverly, New Jersey, was within a terminal area of defendant, the Act does not require a certificate of public convenience and necessity. If, on the other hand, the shipments to Beverly, New Jersey, were not part of a pick-up and delivery service or Beverly, New Jersey, was not within a terminal area of defendant, they would constitute a line-haul

service or intercity operation requiring said certificate. The final determination must resolve itself around the question of what constitutes the boundaries of a terminal area, for all pick-ups and deliveries outside of that area must be deemed line-haul service or intercity operations.

█ █ It is true, as pointed out by the government, that "performance within terminal areas of transfer, collection, or delivery services", as mentioned in the Act, applies only to local service as a part of and incidental to the services authorized to be performed by the line-haul carrier, and that such service, if within the line-haul carrier's terminal area, is performed under the authority of the line-haul carrier, but the argument of the government that the question of terminal areas can arise only when there are two carriers engaged in performing the transportation, a line-haul carrier and a local pick-up or delivery carrier, does not follow. The section of the Act to which the government refers in its argument, section 202(c)(2)[3] does pertain only to such a case. However, it is certainly possible for a line-haul carrier to transfer a shipment for its own account, which involves pick-up or delivery within its own terminal area.

Defendant was authorized in its certificate to service Hanover, Pennsylvania. It contracted to and did transport the shipments questioned to Beverly, New Jersey. The nearest terminal point to Beverly, New Jersey was Philadelphia. Was Beverly, New Jersey, within the terminal area of Philadelphia at that time?

On this question defendant submits "that a certificated motor carrier authorized to operate between fixed terminii *does not need further certificate authority* from the Commission to perform its accustomed terminal collection and delivery services *even outside the corporate limits*." It refers to the case of Consolidated Freight Lines, Inc., Com.Carr. Application, 11 M. C.C. 131, in which a motor carrier filed a "grandfather" application and sought authority for pick-up and delivery services at points connecting with its regular routes, and asserts that the Commission therein recognized its power to regulate limits of pick-up and delivery operation, and acknowledged that it would do so later, but that no certificate authority was necessary for the performance of accustomed terminal services. The Commission decided that this was a normal part of line-haul motor carrier service, that applicant rendered this service for some time previously and that no special authorization was necessary. The Commission then said:

"Where applicant is authorized to serve a particular city, this service for the present may be rendered within the commercial zone thereof, although that area may exceed the corporate limits. We will leave for our future regulation the matter of appropriate limitations in this respect. Applicant's testimony also shows that its local operations along the highways and 'backbone' of its regular routes have always included pick-up and delivery service within 1 mile of its regular-route highways. Authority to continue this practice will be granted." 11 M.C.C. 131, at page 136.

There can be no doubt that Consolidated Freight Lines commonly made pick-ups and deliveries along its routes within a one mile radius, and that this was the basis of the Commission's permission to continue the practice until such time as definite limitations could be fixed. The opinion of the Commission was confined to the facts of the particular case. Proof of this is found in a further consideration of the application appearing in 27 M.C.C. 697, as follows:

"In authorizing applicant to continue its pick-up and delivery service at origins and destinations in connection with its own line-haul movements, we said, at page 136 of the prior report:

" 'Where applicant is authorized to serve a particular city, this service for the present may be rendered within the commercial

---

[3] "(2) to transportation by motor vehicle by any person (whether as agent or under a contractual arrangement) for a common carrier by railroad subject to chapter 1 of this title, an express company subject to chapter 1 of this title, a motor carrier subject to this chapter, a water-carrier subject to chapter 12 of this title, or a freight forwarder subject to chapter 13 of this title, in the performance within terminal areas of transfer, collection, or delivery service; but such transportation shall be considered to be performed by such carrier, express company, or freight forwarder as part of, and shall be regulated in the same manner as, the transportation by railroad, express, motor vehicle, or water, or the freight forwarder transportation or service, to which such services are incidental." 49 U.S.C.A. § 302(c)(2).

zone thereof, although that area may exceed the corporate limits. We will leave for our future regulation the matter of appropriate limitations in this respect.'

"This statement was not intended to have general application to all motor carriers but to be confined to this particular proceeding and the record therein. Upon further consideration of the record, we find it possible to be more definite. The evidence shows that applicant has served points within 1 mile of the corporate limits of cities and towns on its regular routes, and authority to continue such service will be granted herein." 27 M.C.C. 697, at page 702.

This point may be emphasized by reference to the statements of the Commission with reference to the extent of terminal areas in the unreported decision in Charles Bleich Com. Carr. Application, Division 5, May 13, 1944, as follows:

"Moreover the Act does not define the words 'terminal area' and neither do they have any definite generally accepted meaning which we can apply with mathematical certainty in any particular case. The extent of a forwarder's terminal area in any particular point depends upon many factors and each case must be determined in the light of its own particular facts * * *."

 The most that can be said of the Commission's opinion as to the limits allowed for pickup and delivery services where the limitations have not as yet been fixed by the Commission, is that the service *may be rendered* within the commercial zone of a particular city which an applicant is authorized to serve. In the case at bar, that city is Philadelphia. The commercial zone of Philadelphia was determined in the case of Philadelphia, Pa. Commercial Zone, 17 M.C.C. 533. It included a New Jersey area as follows: Corporate limits of Camden, Gloucester City, Woodlynne, Merchantville and Palmyra Boroughs, and the area included in Pennsauken Township in Camden County. It did not include Beverly, New Jersey. Hence the first contention of defendant must fail.

 Now we shall consider defendant's second and third proposals. It is the administrative function of the Commission to define and limit the territory of a motor carrier's terminal area. Defendant submits that the Commission has not yet fixed that area. In our opinion the Commission has set up standards with the terminal area of Philadelphia by its determination of the commercial zone of that city, and we have not been shown any determinations of the Commission from which it is possible to infer that in defining the terminal area of Philadelphia it would extend its boundaries past the commercial zone.

The following administrative ruling No. 87, made by an agency of the Commission, the Bureau of Motor Carriers, may be deemed to be evidence of the position that the Commission would formally take of the question involved therein:

"Question: A regular route common carrier of property by motor vehicle is authorized to serve certain terminal, intermediate, and off-route points. In respect of certain of them, the places of business of some shippers, although an integral part of the business community near which they lie, are situated outside the corporate limits of the point authorized to be served. Is additional authority required to handle the business of such shippers? Answer: The Bureau considers the intent of the Commission in issuing operating authority to such carriers to contemplate the service of shippers whose business establishments are in fact an integral part of the business communities near which they are located, if they do not lie within a separately incorporated borough, city, town (other than the New England type), or village, not specifically authorized to be served. In order that there may be definite and uniform administration under the foregoing interpretation, regular route common carriers by motor vehicle authorized to serve a given point, may serve all places which lie wholly within one quarter mile of the incorporated limits of said point, if the population thereof is 2500 or less; within one half mile, if the population is between 2500 and 10,000; within one mile if the population is between 10,000 and 100,000; and within two miles if the population exceeds 100,000, all such populations to be determined according to the latest report of the United States Census Bureau."

This ruling, although tentative, i.e., until the Commission formally rules on the question, is interpretative of the then present position of the Commission with respect to the problem. Since Beverly, New Jersey, is more than two miles from Phila-

delphia, under this ruling, services by defendant to that point would not be authorized. It is encumbent upon defendant to familiarize itself with the rulings of the Commission and to follow the administrative procedure set up to obtain the proper authorization of its service. It cannot be said that it is the duty of the Commission to define the terminal area of each and every motor carrier, and until that is done, that the Commission has not the right to prevent a motor carrier from acting in a manner which it [the carrier] deems lawful. Rather, the common carrier, who is in a position to apply for authority, has the burden of securing the same in what it deems to be a borderline case. However, in the instant case the rulings of the Commission concerning the limits of the City of Philadelphia were ample for the purpose of determining whether shipments to Beverly, New Jersey, may be included in authorization to service Philadelphia, and we conclude that the defendant was not warranted in assuming that by reason of any act of omission or commission by the Interstate Commerce Commission it had a right to deliver in Beverly, New Jersey, as charged in the information.

■ For its fourth point the defendant urges the fact that an application was made to the Commission by defendant seeking authorization to serve points within 5 miles of Philadelphia before the filing of this information but after the violations complained of therein, the granting of which has been recommended by one of the Commission's hearing officers.

The filing of the application 2 months after the last transaction of which complaint is made has no relevancy to the guilt or innocence of defendant. We cannot sustain defendant's argument that it affects such question.

■ Defendant's fifth point is that it is the equivalent of an "operating department" of the Baltimore Transfer Company. which has a sufficient certificate of public convenience and necessity for operation within 5 miles of Philadelphia. It submits that its operations are encompassed by the "grandfather" certificate of the Baltimore Transfer Company giving it a lawful right to make the shipments in question to Beverly, New Jersey. In support of this point it pointed to its proof showing that the Baltimore Transfer Company owns

its stock and that the officers of the two companies are substantially the same; that the only reason defendant was organized as a corporation in Pennsylvania was in order to meet that state's statutory requirements; that detailed entries in the books of both companies are made of counter-charges at terminal points; that equipment for use in transportation is interchanged between the two companies; that the solicitation of accounts for both companies is carried on by the same solicitors; that it does all the terminal work for its parent, the Baltimore Transfer Company, and itself around Philadelphia and takes care of these shipments as a department of its parent set up for that purpose.

It does admit that in the particular instances of these deliveries to Beverly, New Jersey, it did not set up a charge against its parent on its books and receive an equivalent credit from its parents, which is customary for shipments made for the benefit of the parent company. In support of this point, defendant argues that the government is in fact attacking a method of doing business which is trivial and should not be permitted to convert innocent transactions into criminal offenses.

This contention of defendant must prove futile. It may be conceded that full ownership and control rests in the parent corporation, but they are two separate corporations and separate records are kept. Credits to the account of defendant are made only for business of defendant. Each company operates under separate authority of the Interstate Commerce Commission. There is no proof that the shipments which are the subject of this information were made for or on behalf of the parent. In fact, the bookkeeping entries for these shipments show the contrary and establish that the shipments to Beverly, New Jersey, were made by and for the benefit of defendant, which was credited in the full amount of the compensation received for its services. An analogous situation to the contention of the defendant is that of a father and a son, both of whom are fishermen. The son is unemancipated. The father has a fishing license from the States of New Jersey and Pennsylvania, whereas his son is only licensed to fish in New Jersey. While fishing in Pennsylvania, a warden arrests the son for not having a license to fish in that state. The son claims that the arrest is improper and defends on the theo-

ry that he is using his father's license to fish in Pennsylvania. He could not succeed in overcoming the warden's charge. In relying on the rights of the Baltimore Transfer Company to deliver 5 miles outside of the limits of Philadelphia, defendant is in no better position though the analogy may be a bit oversimplified. We cannot agree with defendant on this point.

Finally, it is urged that the meaning of the statute and administrative regulations thereunder upon which the information is based are at present so lacking in that measure of reasonable certainty and clarity that a conviction of the defendant on the facts involved herein would be a denial of due process of law under the Fifth Amendment of the Constitution of the United States.

The defendant cites the case of Schechter Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, in support of its argument that prosecutions may not be maintained against otherwise innocent people for violations of hazy, conflicting, wholly indefinite and vexatious governmental requirements, even if given definiteness by a presidential administrative order. Our foregoing considerations constrain us to the belief that there was valid and legal basis in fact and in law for this prosecution against the defendant and that the Schechter case has no application because the constitutional rights of the defendant have not been similarly invaded in this case.

We feel that the boundary line beyond which it was illegal for defendant to operate had reasonably clear definition. The defendant operated outside of it at its peril. When agitated by the prospect of prosecution it sought, through the conventional course, to have the Interstate Commerce Commission make a determination consonant with its idea of its proper area of operation. It should have done so before it performed the transactions alleged in the information. That it did so afterward and the general trivial nature of defendant's acts of which complaint are made, when compared with its scope of operation, cannot be held to exculpate defendant of guilt, but go rather to the mitigation of the penalty which defendant has incurred.

A judgment will be entered holding the defendant guilty on all counts of the information and sentence will be imposed on Saturday, April 14, 1945, at Trenton.