**NEW YORK, SUSQUEHANNA & WESTERN RAILROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Interstate Commerce Commission, State of New Jersey, and Board of Public Utility Commissioners of the State of New Jersey, Defendants.**

Civ. A. No. 401–61.

United States District Court
D. New Jersey.

Dec. 7, 1961.

McLaughlin, Circuit Judge, dissented.

Lum, Biunno & Tompkins, by Vincent P. Biunno, Newark, N. J., for plaintiff.

David M. Satz, Jr., U. S. Atty., Newark, N. J., by Raymond W. Young, Asst. U. S. Atty., North Bergen, N. J., and H. Neil Garson, Washington, D. C., for the United States and Interstate Commerce Commission; John H. D. Wigger, Lee Loevinger, C. H. Johns, Jr., Robert W. Ginnane, Washington, D. C., of counsel.

David D. Furman, Atty. Gen. of New Jersey, by Richard Green, Deputy Atty. Gen., for State of New Jersey and Bd. of Public Utility Com'rs.

Before McLAUGHLIN and FORMAN, Circuit Judges, and WORTENDYKE, District Judge.

WORTENDYKE, District Judge.

In this action the plaintiff, Susquehanna, seeks a judgment setting aside two certain "orders" of the Interstate Commerce Commission made on January 18, 1961 and May 10, 1961, respectively.

This Court has jurisdiction by virtue of the provisions of 28 U.S.C. § 1336, which is being exercised appropriately as a three-judge court in accordance with the procedure prescribed by §§ 2321 to 2325 inclusive, and § 2284 of the same Title.

The Commission's order of May 10, 1961 was a denial of a petition for reconsideration of its order of January 18, 1961. Thus plaintiff exhausted its administrative remedy before the Commission before coming here. 49 U.S.C.A. § 17(9); United States v. Abilene & Southern Railway Co., 1924, 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016.

Susquehanna operates a line of railroad as a common carrier for the transportation of passengers from Butler, New Jersey, to New York City. For its corporate history, see In re New York, S. & W. R. Co., 3 Cir. 1940, 109 F.2d 988. The railroad runs three passenger trains in each direction daily, except Saturdays, Sundays and holidays, during commuters' hours only, and no mail, baggage or express is handled thereon. If the operation of these trains is discontinued, no passenger service will be furnished by the carrier. Each train consists of a single-unit diesel locomotive and a single trailing passenger car, and has a crew consisting of an engineer, a fireman, a conductor and a brakeman. Although its trains do not travel eastwardly of a transfer point in North Bergen, New Jersey, its passengers for and from New York City are transported by bus, via the Lincoln Tunnel beneath the Hudson River, between that transfer point and the bus terminal of the Port of New York Authority at 41st Street and Eighth Avenue, in Manhattan. The buses so employed are owned and operated by Public Service Coordinated Transport, a New Jersey corporation, unaffiliated but under contract with the plaintiff.

Susquehanna emerged from reorganization proceedings under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, in

1953. For the year 1960, the cost of operating the trains which Susquehanna seeks to discontinue, including depreciation of locomotives and cars, is alleged to exceed the revenues therefrom by $117,214.

The provisions of Part I of the Interstate Commerce Act apply to Susquehanna. Its railroad includes terminal facilities for the transportation of its passengers and such transportation includes a contract bus service as an instrumentality or facility for the carriage of its passengers between its transfer point in New Jersey and its terminal in New York. Such bus transportation must be considered as performed by Susquehanna, and is subject to regulation "in the same manner as, the transportation by railroad * * * to which such (bus) services are incidental." 49 U.S.C.A. § 302 (c). See New York Dock Railway v. Pennsylvania Railroad Co., 3 Cir., 1933, 62 F.2d 1010, cert. den. 289 U.S. 750, 53 S.Ct. 694, 77 L.Ed. 1495; United States v. Motor Freight Express, D.C.N.J.1945, 60 F.Supp. 288. The Interstate Commerce Commission has regulatory jurisdiction over Susquehanna and its contract bus facility despite the fact that the railroad is a New Jersey corporation whose entire trackage is within that State. Cincinnati, New Orleans & Texas Pacific Railway v. Interstate Commerce Commission, 1896, 162 U.S. 184, 16 S.Ct. 700, 40 L.Ed. 935; Interstate Commerce Commission v. Detroit, Grand Haven & Milwaukee Railway Co., 1897, 167 U.S. 633, 642, 17 S.Ct. 986, 42 L.Ed. 306. The Commission has recognized and exercised that jurisdiction. See New York, S. & W. R. Co., Common Carrier Application (1942) 34 M.C.C. 581; on rehearing (1946) 46 M.C.C. 713. See also Commutation Fares, New York, S. & W. R. Co. (1951) 280 I.C.C. 31. In its Local Passenger Tariff S-W 11, issued September 10, 1960, effective September 21, 1960, under Authority of Special Permission of the Interstate Commerce Commission in Finance Docket No. 20567, New York, Susquehanna & Western Railroad Company—Abandonment of Operation Jersey City, N. J., dated August 8, 1960, plaintiff carrier advertises its fares for passenger transportation throughout its line extending between New York, N. Y., and Butler, N. J.; an aggregate distance of 37.9 miles. Paragraph 11 of the carrier's Rules and Regulations, published in its said Tariff, is captioned, and reads as follows:

"Motor-Coach Terminal Service —New York, N. Y.

"Available only to passengers holding tickets reading as described in paragraph 1 below, upon payment of charge shown in paragraph 2 below:

"1. To or from stations on the New York, Susquehanna and Western Railroad Company, Babbitt, N. J., and stations West thereof, on the one hand, and New York, N. Y., via the Susquehanna Transfer, N. J., on the other.

"2. Motor-coach fare in each direction between North Bergen, N. J. and New York, N. Y., 25 cents."

Erie's discontinuance of its ferry service pursuant to the provisions of 49 U.S.C.A. § 13a(1) had deprived plaintiff of the availability of this ferry service for its passenger transportation into and out of New York City. For background history of the Erie passenger ferry abandonment, see State of New Jersey et al. v. United States et al., D.C.N.J.1958, 168 F.Supp. 324, affd. Bergen County v. U. S., 1959, 359 U.S. 27, 79 S.Ct. 607, 3 L.Ed.2d 625, reh. den. 359 U.S. 950, 79 S.Ct. 722, 3 L.Ed.2d 683.

On December 30, 1960 Susquehanna filed with the Interstate Commerce Commission, pursuant to the provisions of section 13a(1) of the Interstate Commerce Act, a Notice that the carrier would discontinue service of all of its passenger trains described as "operating" between Butler, New Jersey and New York City, and serving various intermediate stations in New Jersey en route. A copy of plaintiff's Notice was served by

mail, on December 29, 1960, upon the Governor of the State of New Jersey, the Secretary of the Board of Public Utility Commissioners of the State of New Jersey, the Governor of the State of New York, the Secretary of the Public Service Commission of the State of New York, the Assistant Postmaster General, and the Railway Labor Executives' Association, and posted in each of Susquehanna's railroad stations, in the Port of New York Authority Bus Terminal in New York City, in each of the motor coaches operated by Public Service Coordinated Transport which carry passengers from and to plaintiff's trains, and in each passenger car of each of those trains.

On January 9, 1961, the State of New Jersey and its Board of Public Utility Commissioners filed a petition with the Interstate Commerce Commission praying that an investigation of plaintiff's proposed train discontinuance be entered upon by the Commission, and that plaintiff's Notice be dismissed without prejudice, upon the ground that its case before the Commission was improperly brought under section 13a(1). To that petition Susquehanna filed an Amended Reply on February 20, 1961, wherein the carrier joined issue upon the contentions made in the petition.[1] By order of Division 4 of the Commission, made on January 18, 1961, the proceeding instituted by plaintiff's Notice was dismissed for lack of jurisdiction because the Commission found that each of the trains proposed to be discontinued by the plaintiff operates solely within the State of New Jersey. The Commission concluded that Susquehanna's Notice, was, therefore, improperly filed under section 13a (1) of the Act. On February 20, 1961, the Railroad filed a Petition for Reconsideration of the Commission's order of January 18, 1961. The Petition for Reconsideration was denied by the Commission's order of May 10, 1961.

The Commission's refusal to reconsider its order denying jurisdiction of the proceeding instituted by the plaintiff under section 13a(1) of the Act constitutes a proper basis for the exercise of the jurisdiction of this Court created by 49 U.S.C.A. § 17(9) and 28 U.S.C. § 1336. The present action presents the single question whether the provisions of section 13a(1) have been appropriately invoked by the plaintiff for the purpose of effecting a discontinuance of its passenger trains enumerated in the Notice filed with the Commission. The position of the defendants in the case is disclosed in their contention that section 13a(1) is applicable only to the discontinuance of "the operation or service of any train or ferry operating from a point in one State to a point in any other State." Because the trains which plaintiff would discontinue do not actually run across the dividing line between New Jersey and New York, but only between points within the State of New Jersey, defendants argue that application for relief before the Interstate Commerce Commission is

1. Carrier's amended reply to the petition of the State and Board disclosed that day-to-day counts of interstate and intrastate passengers using each of the trains which carrier desired to discontinue showed the following daily averages:

| Train No. | Total | Interstate | Intrastate |
|---|---|---|---|
| 908 | 47.7 | 39.7 | 8.0 |
| 910 | 126.4 | 120.1 | 6.3 |
| 916 | 112.5 | 91.2 | 21.3 |
| 919 | 47.9 | 31.5 | 16.4 |
| 923 | 120.1 | 118.6 | 1.5 |
| 929 | 37.0 | 34.5 | 2.5 |

governed by subsection 13a(2).[2] Defendants United States and Interstate Commerce Commission further assert that "the Legislative history of section 13a(1) supports the view that it is intended to allow discontinuance of only trains or ferries, but not of all the rail transportation operation from a point in one State to a point in another State."[3] They do not deny that plaintiff is an interstate carrier, and they concede that it performs its interstate function in part by the use of the contract bus service into and from New York City.

■■■ While the defendants are correct in asserting that the trains which the plaintiff seeks to discontinue *move* exclusively within the State of New Jersey, the interstate *transportation* of passengers which the plaintiff is authorized and required by the Commission to provide (49 U.S.C.A. § 1(4)), is achieved only by means of the combined facilities of those trains and of the bus service which complements them. While it is also true that section 13a(1) contains the significant phrase "the operation or service of any train or ferry," referring to the particular transportation which may be discontinued or changed upon compliance with the other provisions of the section, we are unable to agree with the insistence of defendants that the word "operation" must be equated to "movement." There being no provision in the Act which makes such definition mandatory, we are at liberty to apply the ordinary meaning of the term, which, when used intransitively, means to work, act, or function. To strictly construe 13a(1) as applicable only to a train or ferry as an instrumentality of interstate transportation is to disregard other provisions of the statute, and thwart the apparent purpose of the Congress in adopting it. In construing remedial legislation, narrow or limited construction is to be eschewed.

2. The Conference Report upon S–3778, 85th Cong.2d Sess. (2 U.S.Code Cong. & Adm.News 1958, pp. 3456, 3486), has this to say respecting the proposed new section 13a embodied in section 5 of the Bill: "Paragraph (1) deals with the discontinuance or change of the operation or service of a train or ferry—operating from a point in one State to a point in any other State * * *. A procedure is set up whereby the carrier or carriers concerned may discontinue or change the operation or service (notwithstanding State law) upon giving 30 days' notice to the Interstate Commerce Commission (as well as certain other notice) of intention to do so.

"Paragraph (2) of the proposed new section 13a, * * * deals with the discontinuance or change, in whole or in part, by a carrier or carriers of the same class referred to in paragraph (1), of the operation or service of any train or ferry operated 'wholly within the boundaries of a single State.' The paragraph would operate where such carrier or carriers desire to discontinue or change any such operation or service, and where (1) the discontinuance or change is prohibited by the constitution or statutes of a State, (2) where the State authority having jurisdiction has denied an application duly filed for authority to discontinue or change the operation or service, or (3) where the State authority having jurisdiction shall not have acted finally on such application within 120 days from the presentation thereof. * * * "

3. If the plaintiff intends to terminate *all* railroad transportation over its line between Butler, New Jersey and New York City, the Commission would have clear jurisdiction to entertain its application for leave to do so under section 1(18) of the Act. This Court has already stated in Board of Public Utility Commissioners v. United States, 1957, 158 F.Supp. 98, at page 100, that "It is equally sound that the Commission possesses the right to allow complete abandonment of a railroad branch line though the latter be located wholly within a state. State of Colorado v. United States, 1926, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878. Under that opinion if the contemplated stoppage of the Weehawken passenger ferry effects the complete abandonment of a line of railroad or portion of a line of railroad, the Commission's action was proper. If it is merely the elimination of part of the service of that line, the Commission has no justification for assuming control of the proceeding." That language was used before the new section 13a became law. We are not here called upon to determine whether the Commission in the present case derives jurisdiction from § 1(18).

Rather, in this field, liberal contruction in the light of the prime purpose of the legislation is to be employed. St. Mary's Sewer Pipe Co. v. Director of U. S. Bureau of Mines, 3 Cir., 1959, 262 F.2d 378; citing Lilly v. Grand Trunk Western R. Co., 1943, 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411; Swinson v. Chicago, St. Paul, M. & O. Ry., 1935, 294 U.S. 529, 55 S.Ct. 517, 79 L.Ed. 1041; Sablowsky v. United States, 3 Cir., 1938, 101 F.2d 183. The Act must be read and considered as a whole in the light of national transportation policy. American Trucking Associations, Inc. v. United States, D.C.D.C.1959, 170 F.Supp. 38.

■ In Board of Public Utility Commissioners of the State of New Jersey et al. v. United States, 1957, 158 F.Supp. 98, this Court held that the proposed discontinuance by the New York Central Railroad Company of its passenger ferries between points in New Jersey and the City of New York would constitute but a partial abandonment of a portion of a line of its railroad, which the Interstate Commerce Commission then had no authority to permit, because 49 U.S.C.A. § 1(18) provided only for the abandonment of "all or any portion of a line of railroad." Accordingly, this Court set aside a certificate granted by the Commission, authorizing the railroad to discontinue its passenger service while continuing to transport freight by surface vessel across the Hudson River. In that case the adoption of the Transportation Act of 1958 was foreseen by the Court when it said, at p. 103 of the opinion: "The Congress may in its wisdom decide to grant the requisite authority, although as yet there is no intimation of this from the legislative history, but until such time, the Commission, strictly a creature of its creating statute, is without the power to permit the discontinuance of this partial service." [158 F.Supp. 103.] It is quite obvious that this Court's construction of section 1(18) of the Transportation Act of 1920 emphasized the need of congressional legislation to permit of the very relief which this Court had found unavailable. The answer to

that need was ultimately given in section 13a(1) of the Transportation Act of 1958. Accordingly, by invoking the provisions of this newly added section, other railroads successfully achieved the discontinuance of passenger ferry service across the Hudson River, while still continuing to operate as interstate common carriers by rail. (State of New Jersey et al. v. United States et al., supra) It seems to follow inevitably that the contract buses, by means of which plaintiff had been performing its service as an interstate carrier, must be considered, as were the ferry facilities, to constitute a portion of plaintiff's line of railroad within the jurisdiction of the Commission.

The exclusiveness of the Commission's jurisdiction over terminal facilities and interterminal services of interstate carriers was emphasized in Central Transfer Co. v. Terminal Railroad Association of St. Louis, 1933, 288 U.S. 469, 53 S.Ct. 444, 77 L.Ed. 899, and in City of Chicago v. Atchison, T. & S. F. Ry. Co., 1958, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174. In the latter case a municipal ordinance required that a motor carrier serving interstate connecting railroads for the transportation of passengers across the City, first obtain a certificate of convenience and necessity from the Commissioner of Licenses, and the approval of the City Council, before it could lawfully engage in that business. The United States Supreme Court held that the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., precluded the City from exercising any veto power over the transfer service when performed by the interstate railroads or by their chosen agents because such service was (p. 86, 78 S.Ct. at p. 1068) "at least authorized, if not actually required, under the Act as a reasonable and proper facility for the interchange of passengers and their baggage between connecting lines," and "§ 302(c) of the Act provides that motor vehicle transportation between terminals, whether performed by a railroad or by an agent or a contractor of its choosing, shall be regarded as railroad transportation and shall be subject to the same comprehensive scheme of

regulation which applies to such transportation." Further, at pp. 87 and 88 of the same opinion, 78 S.Ct. at p. 1069 we find an interpretation of congressional policy in the following language of Mr. Justice Black: "The various provisions set forth above manifest a congressional policy to provide for the smooth, continuous and efficient flow of railroad traffic from State to State subject to federal regulation. In our view it would be inconsistent with this policy if local authorities retained the power to decide whether the railroads or their agents could engage in the interterminal transfer of interstate passengers. * * * National rather than local control of interstate railroad transportation has long been the policy of Congress. It is not at all extraordinary that Congress should extend freedom from local restraints to the movement of interstate traffic between railroad terminals."

In Transit Commission v. United States, 1933, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075, the language of section 1(18) of the Act was held to apply to a trackage agreement which enabled an interstate carrier to extend its traffic beyond its own terminus over the line and to and from the terminus of another carrier. At page 127 of the opinion in that case, 53 S.Ct. at page 538, the Court states that: "Prior to the Transportation Act, 1920, regulations coincidentally made by federal and state authorities were frequently conflicting, and often the enforcement of state measures interfered with, burdened, and destroyed interstate commerce. Multiple control in respect of matters affecting such transportation has been found detrimental to the public interest as well as to the carriers. Dominant federal action was imperatively called for. * * * (Continuing on p. 128 [53 S.Ct. at p. 538].) * * The Act, including paragraph (18) and related provisions, is construed to make federal authority effective to the full extent that it has been exerted and with a view of eliminating the evils that Congress intended to abate." See also South-

ern Railway Co. v. Reid, 1912, 222 U.S. 424, 32 S.Ct. 140, 56 L.Ed. 257.

All parties concede that the question which we are called upon to answer is whether, under the circumstances disclosed in Susquehanna's petition to the Commission, relief should be afforded under subdivision (1) or under subdivision (2) of section 13a of the Act. Plaintiff has been, and is now discharging its obligation as an interstate railroad common carrier by a combination of train and bus service, furnishing passenger carriage between New York and New Jersey. The bus service complements that of the train; the train service complements that of the bus. In combination the two facilities operate from a point or points in one State to a point in another State. A construction of the language employed in subdivision (1) of section 13a which would involve a divorcement or limitation of the jurisdiction of the Commission, and the intrusion of that of the Board of Public Utility Commissioners over the existing facilities employed by Susquehanna, would preclude the attainment of the objective obviously contemplated by the Congress.

We, therefore, conclude that the Commission had jurisdiction over the proceeding instituted by Susquehanna under the provisions of section 13a(1) and that its order of January 18, 1961 refusing to take jurisdiction thereof was contrary to law, and should be reversed.

McLAUGHLIN, Circuit Judge (dissenting).

Prior to the enactment of Section 13a (1) of the Interstate Commerce Act there was no authority then existing which countenanced abandonment by a carrier of its passenger ferry service between New Jersey and New York. Board of Public Utility Commissioners of New Jersey v. United States, 158 F.Supp. 98 (D.C.N.J.1957). Thereafter the present Section 13a(1) was added to the Interstate Commerce Act, 49 U.S.C.A. § 13a (1) effective August 12, 1958. That specifically gave carriers, subject to the mechanics of the section, the right "to the

*discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State \* \* \*."* (Emphasis supplied.)

There is no denial that the section was directed to a particular train or ferry and the legislative history makes this crystal clear. The section was used almost immediately for its avowed purpose, i. e. to justify the extinguishment of the passenger ferry with which the Board of Public Utility Commissioners, etc. litigation, supra, was concerned and of the Erie passenger ferry (also used by complainant). See State of New Jersey v. United States, 168 F.Supp. 324 (D.C. N.J.1959) (New York Central case); State of New Jersey v. United States (Erie and New York, Susquehanna case), 168 F.Supp. 342 (D.C.N.J.1959). As finally passed, there was not the slightest idea that § 13a(1) could be at all available regarding "any train which operates within a State, whose origin and destination are within the State— that is, any train with intra state characteristics—together with the facilities used by the train, shall be completely under the authority of the State public utilities commission, and shall not be in any way affected by the language of this particular proposal, to which the Senator from Georgia objects." Declaration by Senator Smathers, author of the then bill, 104 Cong.Rec. June 11, 1958 p. 10852. At p. 10854 of the same record Senator Smathers stated an underlying principle of the amendment to be that "If a train originates within a State \* \* \* and ends within a State, without crossing a State line, that particular train could be discontinued only with the approval of the State regulatory agency, under the amendment." There was never any change in that fundamental concept, suggested or authorized. Throughout the legislative history it is plain that, aside from a particular train, the only other item to be covered by the amendment was a ferry. Buses were neither mentioned or considered. It definitely was never intended by Senator Smathers

that an element foreign to the avowed objective of the legislation be concealed within his frank commitment and urged later as coming under § 13a(1). The Interstate Commerce Commission itself, which had so readily acquiesced in the end of the mentioned passenger ferry service between New Jersey and New York, at no time ever attempted to distort the meaning of § 13a(1) by construing it as allowing discontinuance of purely intra state trains because buses took passengers from them at the end of the railroad in New Jersey and transported them to New York.

The statute is a lean, lucid law. It cannot be misconstrued as it stands. The majority opinion refuses to take on that impossible task. So it rests its reversal of the Interstate Commerce Commission on the proposition that what the latter does in its decision is "thwart the *apparent* purpose of Congress in adopting it." (Emphasis supplied.) Actually, the true purpose of Congress is expressed in the unmistakable language of § 13a (1) itself. That language cannot be wrenched apart to absorb the expedient endeavor to do now what was never contemplated when the amendment was enacted.

It is argued that "bus" must be taken as included in the "service of any train". That cannot conceivably make sense where "ferry", no more or less important in the circumstances than "bus", was deliberately and directly named and the phrase "service of any" applied to it exactly as to "train". If § 13a(1) had been meant to contain the power to wipe out an entire intrastate railroad passenger service by tying it into the interstate connecting buses, the word "bus" would have been placed in the amendment as was the word "ferry". If that had occurred, in all probability, the amendment would never have passed the Senate. It does seem rather conclusive that all of the legislative history re the amendment, both affirmative and negative, vividly establishes that its language is meaningful and is exactly what was agreed to.

The railroad objects to the definition of a "train" as given by the United States Supreme Court in United States v. Erie R. R., 237 U.S. 402, 407, 35 S.Ct. 621, 624, 59 L.Ed. 1019 (1915), where the Court said that a train " * * * consists of an engine and cars which have been assembled and coupled together for a run or trip along the road." The railroad would put this in the same category as Miss Stein's "a rose is a rose * * *." It might be noted that to date, a rose is still a rose. Also that as far as Section 13a(1) of the Interstate Commerce Act is concerned, within its categorically limited purpose and language, a "bus" is neither " * * * the operation or service of any train or ferry operating from a point in one State to a point in any other State * * *."

For plaintiff to prevail the Interstate Commerce Commission must be held to have grievously erred in law by concluding it had no jurisdiction to permit the railroad to divest itself of its passenger service. Even on this legal question, the Commission's deep, special knowledge of the problem in this case is of the utmost importance. Admittedly it had no right to sanction abandonment of New Jersey—New York harbor ferries until section 13a(1) became the law. Admittedly it was completely familiar with the Smathers bill. It knew that under the resultant amendment to the Act, it was given the power to approve the discontinuance of a single train or ferry. It knew the amendment went no further than that. It knows that the kind of control involved in this action or otherwise was never sought for the Commission in § 13a(1) by complainant, other carriers or anyone else. The Commission therefore rightly refused to accept complainant's present fantastic interpretation of Section 13a(1) proffered, not with any claim that it was ever dreamt of when § 13a(1) was passed, but under the transparently unsupportable suggestion that "bus" must be taken as part of § 13a(1) since the latter is "remedial legislation". In view of the success in obtaining legislation to do away with the ferries an equivalent result might be obtained as to buses. But meanwhile, the passenger trains, which plaintiff seeks to discontinue, operate solely within the State of New Jersey and the matter of their discontinuance is not within the jurisdiction of the Interstate Commerce Commission.

I would therefore uphold the Commission's dismissal of the proceeding.