BOARD OF PUBLIC UTILITY COMMIS-
SIONERS OF The State of NEW JER-
SEY, and the State of New Jersey,
Plaintiffs,

v.

UNITED STATES of America, Interstate
Commerce Commission, Defendants,

and

New York Central Railroad Company,
Intervenor.

Civ. No. 559–57.

United States District Court
D. New Jersey.

Dec. 10, 1957.

Grover C. Richman, Jr., Atty. Gen.,
of New Jersey, by David D. Furman,
Trenton, N. J., and Maxwell A. Howell,
Washington, D. C., Milton T. Lasher,
Hackensack, N. J., for Bergen County,
intervenor-plaintiff.

William A. Roberts, Washington, D.
C., for intervenors and State of New
Jersey.

James M. Davis, Jr., Mount Holly,
N. J., for Brotherhood of Railroad Train-
men, Brotherhood of Locomotive Engi-
neers and Robert J. Kilpatrick.

Kent F. Brown, Albany, N. Y., for New York Public Service Commission.

Archibald N. Jordan, New York City, for the Estate of Conrad Jordan, deceased.

Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., John H. Wigger, and Charlie H. Johns, Jr., Washington, D. C., for the United State and Interstate Commerce Commission.

Edward V. Ryan, Newark, N. J., and Gerald Dwyer, New York City, for New York Central Railroad Company.

Before McLAUGHLIN, Circuit Judge, and SMITH and WORTENDYKE, District Judges.

McLAUGHLIN, Circuit Judge.

This action, under 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325 and 5 U.S.C.A. § 1009, is brought by the New Jersey agency administering that state's regulatory powers over public utilities and by the state itself. It arises from the Order of the Interstate Commerce Commission of May 15, 1957 which on petition for reconsideration filed by these plaintiffs and others, affirmed the jurisdiction of the Commission and sustained the report, order and certificate of its Division 4, permitting abandonment by the New York Central Railroad of its ferry service across the Hudson River between Weehawken, N. J., and New York City, N. Y. The New York Central Railroad has been allowed to intervene as a defendant. The Counties of Rockland, New York, and Bergen, New Jersey; the New Jersey municipalities of Bergenfield, Bogota, Dumont, Harrington Park, Haworth, Norwood, Ridgefield Park, Teaneck and Weehawken, the Citizens United Transit Committee, an unincorporated association of West Shore commuters; the Brotherhoods of Railroad Trainmen and of Locomotive Engineers; and Robert J. Kilpatrick are plaintiff-intervenors. The Public Service Commission of the State of New York has been permitted to appear as amicus curiae.

The New York Central Railroad or its predecessors since 1883 have furnished railroad passenger and freight service on the West Shore line (now known as the River Division) along the west bank of the Hudson River between Albany, New York and New York City, by way of Weehawken, New Jersey. The final portion of the line is a passenger and freight water service across New York Harbor from Weehawken to Manhattan. The application to the Commission for leave to abandon the passenger ferry service is part of an overall effort by the railroad to put an end to its West Shore passenger service, because of alleged serious financial losses in connection therewith though at the same time retaining its profitable freight operation on that line.

The dispositive question here is one of jurisdiction. Has the Commission the power to permit this railroad to discontinue its passenger ferry service across the Hudson River between Weehawken, New Jersey and New York City? The sole source of authority claimed by the Commission and urged by the carrier is Section 1, Paragraph (18) of the Interstate Commerce Act, inserted by 41 Stat. 477 (1920), as amended 49 U.S.C.A. § 1(18). That reads:

"No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, *and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until*

100

*there shall first have been obtained
from the commission a certificate
that the present or future public
convenience and necessity permit of
such abandonment.* * * * " (Emphasis supplied).

■ It is to the italicized portion that the Commission and railroad point. There can be no possible doubt about the validity of the applicable principal derived from that language. It is that the Commission has no right to permit only a partial discontinuance of the operations over a particular railroad line. Plainly Section 1(18) above bestows no such right. What the Commission and railroad insist upon is that the present situation involves the complete abandonment of a portion of a line of railroad and not simply discontinuance of the passenger service of that portion of the line; therefore, that it is within the province of the statute.

■ That ferries are included within the definition of "railroad" is evidenced by Section 1(3) of the Act which provides that "The term 'railroad' as used in this part shall include all * * * ferries used by or operated in connection with any railroad." The Commission has jurisdiction over the establishment of rates payable including those payable by passengers riding on railroad-operated ferries who do not, concomitant with their ferry travel, also ride on trains. New York Central & Hudson River R. Co. v. Board of Chosen Freeholders of Hudson County, 1913, 227 U.S. 248, 33 S.Ct. 269, 57 L.Ed. 499. It is equally sound that the Commission possesses the right to allow complete abandonment of a railroad branch line though the latter be located wholly within a state. State of Colorado v. United States, 1926, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878. Under that opinion if the contemplated stoppage of the Weehawken passenger ferry effects the complete abandonment of a line of railroad or portion of a line of railroad, the Commission's action was

proper. If it is merely the elimination of part of the service of that line, the Commission has no justification for assuming control of the proceeding.

■ The problem is one of first impression as far as the courts are concerned. It is asserted that the so called Lackawanna case[1] is squarely against the jurisdictional arguments of the plaintiffs. Actually, the Commission's jurisdiction was not challenged in that litigation, was never before the court and not passed upon by that court. Some reference is made to an unpublished memorandum opinion in West 23rd Street Ferry Association v. The Hoboken Ferry Co., (S.D.N.Y. Dec. 31, 1946 C.A. 39–370). That was on motion for a stay. There is not the slightest indication from the extremely short opinion that the plaintiff had raised the question at all and the indications from the Commission hearing are to the contrary.

Following the 1920 bestowal upon the Commission of authority to allow abandonment of a line or portion of a line of railroad, that body in a series of opinions sharply distinguishing between partal discontinuance of servce and complete abandonment of a line or of a portion thereof, held that discontinuance of passenger service where the freight operation was being maintained was not the complete abandonment of a line of railroad called for by Section 1(18) and consequently was beyond the power of the Commission to grant. In Kansas City Southern Ry. Co. Application, 94 I.C.C. 691, 692 (1925) there was a proposed discontinuance of regular passenger and freight service with the lines involved continuing to operate intermittent freight service. The Commission held that the application "is not an abandonment within the meaning of that term as used in paragraph 18 of Section 1 of the Act and that we are, therefore without jurisdiction under that section to authorize such partial discontinuance of service." In Morris and Essex Rail-

1. Board of Public Utility Commissioners of New Jersey v. United States, D.C.1955, 132 F.Supp. 379.

road Co. Abandonment, 174 I.C.C. 49, 52 (1931) the application asked for total abandonment, both freight and passenger, of a portion of a railroad line and of just the passenger service of the balance. The New Jersey Board of Public Utility Commissioners had denied a similar petition. The Commission recognized its jurisdiction over the first part of the application but, holding it had no authorty over the second and that the latter was an essential constituent of the application, denied the entire request.

Within a year there was a third major Commission ruling on this same subject in Norfolk & W. Ry. Co. Abandonment, 187 I.C.C. 66 (1932). One branch of the petition in that case asked for "abandonment of service, with the exception of daily freight service * * *." This was dismissed "as curtailment of service is not within the purview of section 1(18) of the act." Other Commission opinions forcibly reiterating the doctrine are: Chicago N. S. & M. Ry. Abandonment, 290 I.C.C. 765, 766 (1955); Express Service at Borden, Campbellsburg, and Pekin, Inc., 285 I.C.C. 303, 305 (1952); Chicago, B. & Q. R. Co. Control, 271 I.C.C. 63, 67 (1948); New York Central R. Co. Abandonment, 254 I.C.C. 745, 765 (1944); Boston & M. B. Abandonment, 249 I.C.C. 507, 508 (1941); Old Colony R. Co. Trustees, Abandonment, 244 I.C.C. 303, 334 (1941); New York, N. H. & H. R. Co. Reorganization, 239 I.C.C. 337, 381 (1940); Gulf, T. & W. Ry. Co. Abandonment, 233 I.C.C. 321, 331 (1939); Maine Central R. Co. Abandonment, 207 I.C.C. 97, 100 (1935).

The Supreme Court of the United States in Palmer v. Commonwealth of Massachusetts, 1939, 308 U.S. 79, 60 S.Ct. 34, 37, 84 L.Ed. 93, upheld the view of the Commission in refusing to permit the discontinuance of passenger service because of lack of Commission jurisdiction "over curtailments of service and partial discontinuance." Again, in Alabama Public Service Commission v. Southern R. Co., 1951, 341 U.S. 341, 346, 71 S.Ct. 762, 766, 95 L.Ed. 1002, note 7, where the dispute centered around the discontinuance of passenger service, the court commented "This is a proposed partial discontinuance and not an abandonment over which the Interstate Commerce Commission is given exclusive authority under 49 U.S.C. § 1(18–20), 49 U.S.C.A. § 1(18–20)." The statutory court in Gulf, M. & O. R. Co. v. Louisiana Public Service Commission, D.C.E.D.La.1954, 120 F.Supp. 250 at page 251, ruling specifically on the discontinuance of passenger service by virtue of Section 1(18) held, "Where, however, the railroad is merely discontinuing a portion of its service, whether it be passenger or freight, there is no abandonment under Section 1(18–20), State of Colorado v. United States, supra * * *."

The single franchise under which the West Shore Railroad (predecessor of the New York Central) operated across the Hudson River called for a unified passenger and freight service. The evidence is that " * * * they were an indivisible contract. They could not be separated." It is further established by the record that the New York Central intends to maintain its freight service under the above franchise, simply discontinuing its passenger ferries.[2]

---

2. Claiborne-Annapolis Ferry Co. v. United States, 1932, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808, among other things, is suggested by the defendants as removing charter powers from any decisional weight in this action; whether that thought is accepted or not, the instant charter powers undeniably reveal that New York Central's ability to cross New York Harbor is founded on the original combination passenger and freight franchise. But the Claiborne opinion is far more significant and helpful on the primary dispute in this suit, namely, jurisdiction.

Briefly, the Claiborne ferry was for the transportation of passengers and property under its franchise. It was a wholly owned subsidiary extension of the owner railroad. The petition of the railroad to the Commission for permission to operate the ferry for transportation of passengers and property was allowed. We have no quarrel with that, merely

Contemporary state phases of this same controversy are most pertinent to the issue before us and should be noted. The New York Central, at the time of its application to the Interstate Commerce Commission with respect to its Weehawken Ferry, also sought permission from the New Jersey Public Utility Commission and the New York Public Service Commission to discontinue passenger traffic over its West Shore line, the branch concerned. Plaintiffs argue strongly that the railroad in those instances pursued the proper and ordinary course to be followed where simply partial abandonment of function is desired. Recognition of the state authority by a railroad line with respect to dropping one of two or more services is the usual procedure, witness the current request of the Baltimore & Ohio Railroad to the particular state boards for the right to end its passenger service between Washington and New York.

Commenting on the very proposals of the New York Central to the State Utility Commissions for authority to discontinue West Shore passenger service, the Interstate Commerce Commission Examiner in his report to the Commission said, "As the discontinuance of passenger train service over trackage also used for freight service is not an abandonment of 'all or any portion of a line of railroad', jurisdiction to approve such proposals is not vested in the Commission."

The defendants admit that in discontinuing the passenger ferries, it is solely passenger and vehicular traffic which the railroad is stopping. They admit that the freight originating on the West Shore line, as do the passengers, and carried to the same Weehawken terminal will be brought to Weehawken as before and transported across New York Harbor by the same freight ferries as always. New York Central's petition to the New Jersey Utilities Board to drop West Shore passenger service coming into the Weehawken terminal is acknowledgement that its request is not under Section 1(18). Despite all this, defendants urge that the freight carriage bears no relation whatsoever to the passengers coming in on the same line and who continue their forward movement across the harbor to New York City just as does the freight.

The Commission and the railroad strive at length to show a physical differentiation between the passenger and freight facilities. The Commission opinion states:

"The ferry terminals, docks, vessels and other facilities and services of Central are maintained physically separate from the car float and lighter equipment and other facilities used in transporting freight across the river. Neither the 42d Street, nor the Cortlandt Street ferry terminals are served by railroad tracks. The services and materials provided for the freight and passenger operations are entirely distinct from each other, or, the charges for each are clearly separable according to regular accounting methods of assigning costs."

The distinctions outlined are without a difference. The fail utterly to indicate any substantial disassociation of the ferry from its rail member. On the whole record they do not support the Commission's thesis that the passenger and freight services of the one railroad line have suddenly become separate and independent lines because they are water-

stating that if later the railroad had requested the Commission for the right to discontinue the passenger phase of the ferry extension of its line, the circumstances would be basically identical with the case at bar. However, because the Claiborne ferry dealt with a minor traffic condition it could handle its freight on the same vessel as the passengers. Therefore, though the distinction is more

apparent than real, it is easy to recognize the validity of the proposition that discontinuance of Claiborne's passenger service by itself would have been beyond the jurisdiction of the Commission for it would have been only a portion of the service of the ferry extension of the railroad which was being cancelled and that could not have been accomplished under Section 1(18).

borne across the harbor to the end of the same one original line.

The thought that the passenger and freight traffic do not have the same docks on the New York side is de minimus. That municipality controls its waterfront and its water transportation ties up as the city directs. Commuter passenger traffic rightfully is given convenient disembarkation locations. The associated freight can well be accommodated in less favored spots; these may be some distance away and are probably far more satisfactory sites for freight delivery. The repair and maintenance facilities are the same for the passenger and freight vessels. They are repaired in the one shop by the one group and with the same equipment. The personnel handling the two services belong to the same union.

Defendants argue that after the one passenger and freight line arrives at Weehawken it divides into a number of separate branches to reach New York City, its final destination. Two branches are the passenger-carrying ferries to 42nd Street and Cortlandt Street; the others are the freight-carrying barges proceeding to numerous freight terminals and piers. The argument seems artificial and contrived. It elicits a picture of a maze of branch line bridges and tunnels extending across the Hudson from Weehawken to all the points served on Manhattan. That unreal result can hardly be said to reasonably emanate from the simple fact of one line of railroad, passenger and freight, passing through Weehawken on its way to its terminus on the other side of the harbor.

With reference to harbor bridges and tunnels, if the railroad had a bridge across the harbor or a tunnel under it or access to either and if it were desirable from an operative standpoint, all its passenger and freight trains could move across the bridge or through the tunnel to Manhattan and there could be no attempt to differentiate between the services. There certainly could be no application to the Commission to abandon the passenger element of the harbor portion of the line. That move, if made, would be to the New Jersey Utility Commission and its New York counterpart.

And if the railroad had such a bridge or tunnel over which part of its traffic moved while the rest traversed the river by boat, an attempt to discontinue either boat or tunnel traffic while retaining the other would be only partial discontinuance of service and not an abandonment of a line or a portion of a line of railroad over which the Commission would have jurisdiction.

Absent a bridge or tunnel, passengers can be and are shifted far more quickly and conveniently on separate vessels instead of being delayed while the freight is unloaded from the railcars and loaded aboard boats. It is because of this that the West Shore passengers are sent across the harbor on special ferries while the West Shore freight follows when ready. The distinction between the ferry boats used for transporting passengers and the lighters and barges used for moving freight is no more significant in determining whether this is only one line of railroad than would be the distinction between freight and passenger cars. The human and freight ferries are no more and no less than the continuance of the West Shore line to New York City. That being so, no amount of wordage, no hint that the judgment of the Commission should be accepted, can bestow jurisdiction of this cause upon that tribunal for there is none. The Congress may in its wisdom decide to grant the requisite authority, though as yet there is no intimation of this from the legislative history, but until that time, the Commission, strictly a creature of its creating statute, is without the power to permit the discontinuance of this partial service.

Regarding the second section of this suit, which attacks the Commission's determination of public convenience and necessity, we have serious doubts of the adequacy of the findings of fact and of their support by substantial evidence, but because of the definitive conclusion

of lack of jurisdiction we do not pass upon the point at this time.

A third problem is the specific contention that the Commission's decision is an invasion and usurpation of the jurisdiction of the states of New Jersey and New York. For the reason expressed we will not deal with that question either at this time.

Such findings of fact and conclusions of law as are necessary to our decision are expressed in this opinion.

The certificate granted by the Commission in Finance Docket No. 18781, dated May 15, 1957, is in excess of the statutory powers of the Commission and will be set aside and for nothing holden. Proposed decree to be submitted.