STATE OF NEW JERSEY and Board of Public Utility Commissioners of the State of New Jersey, Plaintiffs,

and

County of Bergen, State of New Jersey; County of Rockland, State of New York; the Boroughs of Bergenfield, Bogota, Dumont, Harrington Park, Haworth, Norwood and the Township of Teaneck; and the Citizens United Transit Committee, an unincorporated association, Intervenors,

v.

The UNITED STATES of America, The Interstate Commerce Commission and The New York Central Railroad Company, Defendants.

Civ. A. No. 1002–58.

United States District Court
D. New Jersey.

Nov. 25, 1958.

Judgment Affirmed March 2, 1959.
See 79 S.Ct. 607.

326

David D. Furman, Atty. Gen. of State of New Jersey, and Howard T. Rosen, Newark, N. J., for plaintiffs.

Roberts & McInnis, Washington, D. C., by William A. Roberts, Washington, D. C., for plaintiff-intervenors.

Edward V. Ryan, Newark, N. J., Gerald Dwyer, and Thomas E. Dewey, New York City, for defendant New York Cent. R. Co.

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by Herman Scott, Asst. U. S. Atty., Newark, N. J., and Charles Esherick, New York City, for defendant Dept. of Justice.

Robert W. Ginnane, Washington, D. C., for defendant Interstate Commerce Commission.

Before McLAUGHLIN, Circuit Judge, and SMITH and WORTENDYKE, District Judges.

WORTENDYKE, District Judge.

A branch line, commonly known as the West Shore Line of the New York Central Railroad Company (Central) transports commuting passengers by rail and ferry between their homes in Rockland County, New York, and Bergen County, New Jersey, and their places of employment in Greater New York City. The rail line of this branch terminates at Weehawken, New Jersey, which is located on the west side of the Hudson River, but the line is continued across the Hudson River to the City of New York by means of ferry boats. Central's passengers cross the river in each direction, daily, by means of the ferries. For a period of years Central has been operating these ferries, as far as the transportation of passengers is concerned, at a substantial financial loss.

In December 1954, Central made application to the Interstate Commerce Commission, pursuant to section 1(18) of the Interstate Commerce Act, as amended by the Transportation Act of 1920, 41 Stat. 477, 49 U.S.C.A. § 1(18), for a certificate that public convenience and necessity permitted the abandonment of its Hudson River ferries. After extended hearings, the Commission's Division 4 reported that Central was entitled to such a certificate, 295 I.C.C. 385, and this was affirmed by order of the full Commission on May 15, 1957. 295 I.C.C. 519. Before the effective date of the ferry abandonment authorized by that order the present plaintiffs, Board of Public Utility Commissioners of the State of New Jersey (Board) and the State of New Jersey (State), brought an action in this Court to review the Commission's order. Board of Public Utility Commissioners of New Jersey v. United States, D.C.1957, 158 F.Supp. 98. We decided in that case that the Commission was without jurisdiction to authorize Central to discontinue its passenger ferry service from Weehawken to New York City, while continuing to operate its waterborne freight transportation service by ferriage between the same cities. In reaching that conclusion we held that the discontinuance of passenger ferry service was not an abandonment of a portion of a line of railroad within the meaning of Section 1(18) supra, and therefore was beyond the power of the Commission to authorize. Cf. Gulf, M. & O. R. Co. v. Louisiana Public Service Commission, D.C.La.1954, 120 F.Supp. 250. We are told that an appeal from our decision was taken to and is still pending before the Supreme Court of the United States.

Pending that appeal the Congress enacted the Transportation Act of 1958, Pub.L. 85–625; 85th Cong., 2d Sess., 72 Stat. 568 (August 12, 1958). It is entitled "An Act to amend the Interstate Commerce Act, as amended, so as to strengthen and improve the national transportation system, and for other purposes." By this new legislation there was added to the Interstate Commerce Act, inter alia, a new section designated as Section 13a.

On August 13, 1958, Central, purporting to act pursuant to paragraph (1) of the new Section 13a, filed with the Commission, mailed to the respective Governors of New York and New Jersey and posted in its depots served by the ferries a notice that the operation of these ferries for the transportation of passengers

would be discontinued at 12:01 a. m. on September 13, 1958.

On August 25, 1958, Board and State filed with the Commission a formal complaint requesting that the Commission enter upon an investigation of the proposed ferry discontinuance and set the matter down for hearing. In response to this complaint the Commission gave written notice, dated August 26, 1958, that "Upon consideration of the matters involved, including consideration of the records in Finance Docket No. 18781 (N. Y. Central R. Co. Ferry Abandonment, 295 I.C.C. 385 and 519) and Docket No. 32359 (Fares and changes via Weehawken Ferry) [it] has concluded not to enter upon an investigation of the proposed discontinuance or otherwise to require that such ferry service be continued, in whole or in part."

On September 4, 1958 the present action was instituted, invoking the same jurisdiction as that relied upon in the action to review the Commission's order of May 15, 1957, and additionally that claimed to be conferred by Title 28 U.S.C. §§ 1331 and 2282. Plaintiffs now seek a declaration that this new Section 13a(1) of the Interstate Commerce Act is unconstitutional, that its operation be enjoined, that Central be enjoined from discontinuing its Weehawken-New York ferry service and that the Commission's notice of August 26, 1958 and its order of September 2, 1958, be set aside.[1] Plaintiffs further pray that, if Section 13a(1) be declared constitutional, the Commission be directed to enter upon an investigation of the complaint filed by State and Board respecting the ferry discontinuance, and that Central be ordered to continue the operation of the ferry service pending hearing and decision by the Commission.

Upon due application we granted to the plaintiffs a preliminary injunction on

September 12, 1958, having previously allowed the intervention, as plaintiffs, of County of Bergen, State of New Jersey; County of Rockland, State of New York; the Boroughs of Bergenfield, Bogota, Dumont, Harrington Park, Haworth, Norwood, and the Township of Teaneck; and the Citizens United Transit Committee, an unincorporated association of New Jersey resident commuters. At the same time, the Public Service Commission of the State of New York was permitted to appear as amicus curiae. The operation of the ferries, therefore, continues. We are told that on September 29, 1958 Central applied to the Supreme Court of the United States for a stay of the Court's injunctive order of September 12, 1958 pending the final determination by the Supreme Court of an appeal therefrom, and that the application was denied by Mr. Justice Brennan on October 6, 1958.

Having duly come to issue, final hearing in the present action was held on November 3, 1958.

We recognize jurisdiction here under 28 U.S.C. § 2282 (1952), in conjunction with 28 U.S.C. § 1331 (1952).

██ We find no jurisdiction under 28 U.S.C. § 1336 (1952), because the action is not one to "enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission." On the contrary, the plaintiffs complain of the refusal of the Commission to act, i. e., "to enter upon an investigation of the complaint" of the plaintiffs. No "order" of the Commission is here complained of. Its written notice that it would not investigate the complaint does not constitute such action as is reviewable under § 1336, supra. Cf. Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 59 S. Ct. 754, 83 L.Ed. 1147. As was the case in United States v. Los Angeles & Salt

---

1. The Commission order of September 2 provided that an investigation of the proposed discontinuance of ferry operations be instituted under the provisions of § 13a(1) of the Interstate Commerce Act "solely to determine the conditions,

if any, which should be imposed for the protection of employees affected thereby;" but that petitions for reconsideration of the Commission's decision not to investigate the proposed discontinuance be, in all other respects, denied.

Lake R. Co., 1927, 273 U.S. 299, 310, 47 S.Ct. 413, 414, 71 L.Ed. 651:

> "The so-called order here complained of is one which does not command the carrier to do, or to refrain from doing, anything; which does not grant or withhold any authority, privilege, or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation. This so-called order is merely the formal record of conclusions reached after a study of data collected in the course of extensive research conducted by the Commission, through its employees. It is the exercise solely of the function of investigation. * * *"

The notice given by the Commission in the present case by way of response to the plaintiffs' complaint was nothing other than an announcement that the Commission intended to take no action with respect to the railroad's notice of intention to discontinue the ferries. Section 13a(1) clearly leaves to the absolute discretion of the Commission the determination of whether or not it, upon receipt of a complaint directed against a railroad's notice of intention to discontinue service, shall make any investigation of the matter or avail itself of its temporary veto power by way of suspension within the limitations of the Act. The Act is self-implementing insofar as it affords authorization to a carrier to discontinue service. No provision is made for any action of the Commission to render such authorization effective. The efficacy of the congressional authorization is in no respect dependent upon any action on the part of the Commission. Obviously, therefore, the provisions of 28 U.S.C. § 1336 do not clothe us with jurisdiction here.

No greater jurisdictional assistance is afforded to the plaintiffs by the provisions of 5 U.S.C.A. § 1009, as will appear from the following critical language thereof:

> "Except . so far as * * * agency action is by law committed to agency discretion. (a) Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

In the case before us the statute under review expressly commits to the discretion of the Commission the determination of whether or not it will investigate any complaint which is evoked by a carrier's notice of intention to discontinue. Plaintiffs concede that the statutory language is permissive. Therefore, since the Commission's decision to act or refrain from action was committed to its exclusive discretion, the right of review provided by Section 1009, supra, is, by the terms thereof, unavailable to these plaintiffs. Panama Canal Company v. Grace Line, Inc., 1958, 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788. In that case the initiation of a proceeding for readjustment of Panama Canal tolls was committed, by congressional enactment, to the exclusive discretion of Panama Canal Company, an agency of and wholly owned by the United States and created by Congress for the purpose of operating and maintaining the Canal. Justice Douglas pointed out that Section 1009 excluded from judicial review thereunder agency action which had been committed by law to agency discretion and that the initiation of a proceeding for the readjustment of canal tolls was a matter which Congress had left to the discretion of the Panama Canal Company as an agent or spokesman of the President. Id., 356 U.S. at page 317, 78 S.Ct. at page 757. He continued:

> "The case is, therefore, quite unlike the situation where a statute creates a duty to act and an equity court is asked to compel the agency to take the prescribed action * *. We put the matter that way since the the relief sought in this action is to compel petitioner to fix new tolls.

The principle at stake is no different than if mandamus were sought—a remedy long restricted, Marbury v. Madison, 1 Cranch 137, 166, 2 L.Ed. 60; Decatur v. Paulding, 14 Pet. 497, 514–517, 10 L.Ed. 559, in the main, to situations where ministerial duties of a nondiscretionary nature are involved. Where the matter is peradventure clear, where the agency is clearly derelict in failing to act, where the inaction or action turns on a mistake of law, then judicial relief is often available * * *. But where the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion. (Citing inter alia United States ex rel. Chicago Great Western R. Co. v. Interstate Commerce Commission, 294 U.S. 50, 62–63, 55 S.Ct. 326, 79 L.Ed. 752.) We then must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision." 356 U.S. at page 318, 78 S.Ct. at page 757, supra.

The foregoing language seems completely apposite to the factual situation with which we are here confronted. Section 13a(1) in pertinent part provides that "[u]pon the filing of such notice [of the carrier of its intention to discontinue service] the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change." The unqualified character of the discretion reposed to determine whether or not to investigate is at least as obvious in the foregoing language as in that of the Canal Zone Code authorizing the Canal Company to prescribe and to change the canal tolls. It was in fact so construed on the Senate floor during the debate upon the Act.[2]

We are, therefore, relegated to the exercise of jurisdiction conferred upon this Court by 28 U.S.C. § 2282. In this position we are asked to restrain the operation of Section 13a(1) for repugnance to the Fifth Amendment to the Federal Constitution because, if interpreted as contended for by the defendants, it would deprive the users of the ferries of property without due process of law. Assuming for the purposes of argument that the users of these ferries have a standing to complain of their discontinuance, either directly or through the plaintiffs as their spokesmen, we immediately face the constitutional question.

It is conceded that the operation of these ferries is a facility of interstate commerce, and that "Congress could oust the States of all power to regulate interstate transportation." Federal power over such commerce is derived directly from Article 1, Section 8, cl. 3 of the United States Constitution. This constitutionally bestowed power was characterized by Chief Justice Marshall in Gibbons v. Ogden, 1824, 9 Wheat. 1, at page 86, 6 L.Ed. 23, as follows:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. * * * If, as has always been understood, the sovereignty of Congress though limited to specified objects, is plenary as to those objects, the power over commerce * * * among the several States

2. "Mr. Russell. * * * The Senator speaks about a hearing before the Interstate Commerce Commission. On the notifications which are filed with the Interstate Commerce Commission, there is no hearing, unless the Interstate Commerce Commission, within a certain period of time, determines that one should be had. Unless the Interstate Commerce Commission takes affirmative action to stop the railroad's action within a certain period of time, the railroad determines such action." 104 Cong.Rec. 9762 (June 11, 1958).

is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse."

The exercise by Congress of such power over interstate commerce can only be accomplished by legislation which measures the scope of the exercise of such power. Until a particular aspect in the field of interstate commerce has been regulated by congressional enactment, the States are free to exercise their police and other governmental powers therein. Port Richmond & Bergen Point Ferry Co. v. Board of Chosen Freeholders of Hudson County, 1914, 234 U.S. 317, 34 S.Ct. 821, 58 L.Ed. 1330; State of Colorado v. United States, 1926, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878. It was our recognition of the persistence of State authority until excluded from the field by congressional enactment that brought us to our conclusion in the previous litigation in these matters. Board of Public Utility Commissioners of New Jersey v. United States, supra. The Interstate Commerce Commission was created by Congress for the purpose of receiving and administering such of the congressional power over interstate commerce as was thereby delegated to it. Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 1896, 162 U.S. 197, 211, 16 S.Ct. 666, 40 L.Ed. 940. Because by 49 U.S. C.A. § 1(18) supra, the Commission was authorized to certify that present or future public convenience and necessity permitted the abandonment of a line of railroad, including a ferry, but not a reduction or discontinuance of service upon such a line, we found that the Commission had not been empowered to authorize the discontinuance of the passenger service on the Hudson ferries while the freight service thereon was continued. Cf. Atchison, Topeka & Santa Fe Ry. Co. v. Railroad Commission of State of California, 1931, 283 U.S. 380, 51 S.Ct. 553, 75 L.Ed. 1128. Since we so decided, however, Congress has been heard from most emphatically and distinctly upon the subject then before us, in the language of § 5 of the Transportation Act of 1958, supra. By that language the congressional power over interstate commerce has been wielded directly instead of being delegated for exercise by the Commission. In that section the Congress has clearly disclosed its intention that a carrier subject to the Act, of its own initiative and without any prior authorization, either by Congress or by the Commission, might discontinue a ferry or any portion of its service operated in interstate commerce upon the expiration of thirty days after the filing, service and posting of a written notice of its intention so to do. This legislative delegation of authority to discontinue is expressly unconditionalized by the phrase "the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding." At the same time, however, and in the same section, it is also provided that whenever a carrier shall avail itself of such legislative authority by indicating and publishing its intention to discontinue a service, the Commission shall have the authority, to be exercised within the same thirty day period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance of service. If, upon such investigation the Commission finds, after hearing, that the operation of such a ferry is required by public convenience and necessity and will not unduly burden interstate commerce, it may, by order, require its continuance in whole or in part for a period not to exceed one year from the date of such order. Since Congress, by virtue of its constitutionally-vested ex-

clusive and plenary power over interstate commerce, could always have exercised it without employing the intermediary of a Commission, it can still exercise that power directly by legislative mandate without channeling such exercise through the Commission. Southern Pacific Co. v. State of Arizona, 1945, 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915. In the present case that is exactly what the Congress has done. It has authorized the carrier directly to discontinue service. It has not delegated to the Commission power to authorize such discontinuance, but has made such discontinuance subject to the exercise of a discretionary power by the Commission (1) to investigate the proposed discontinuance and (2) following investigation, to suspend such discontinuance after affording an opportunity to be heard to those who will be affected either by the discontinuance or by the suspension thereof. If, as we conclude, Section 13a(1) amounts to a direct authorization to a carrier subject to the Interstate Commerce Act to discontinue service, in whole or in part, of a ferry operated in interstate commerce, the constitutionality of such an Act is obvious from U.S.Const. art. I, § 8, cl. 3. Thatcher v. Tennessee Gas Transmission Co., 5 Cir., 1950, 180 F.2d 644, certiorari denied 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609; Pennsylvania R. Co. v. Public Service Commission, 1919, 250 U.S. 566, 40 S.Ct. 36, 64 L.Ed. 1142.

■ This Court has no right to say that Congress should not have authorized a carrier to discontinue service or have left to the unreviewable discretion of the Commission the determination of whether or not it should investigate the carrier's contemplated action as a preliminary to a hearing thereon looking to suspension thereof. We so construe the language of Section 13a(1), and as so construed, find it in no respects repugnant to the Fifth Amendment. See Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27; Luxton v. North River Bridge Co., 1894, 153 U.S. 525, 14 S.Ct. 891, 38 L.Ed. 808.

■ Plaintiffs' contention that Section 13a(1) "permits the Interstate Commerce Commission to supersede State regulation of ferry service" is without support in the language used. The supersession of the State regulation is not achieved by any act of the Commission, but results from the statutorily authorized action of the carrier in electing to discontinue service. The constitutionality of such legislative authorization is well established. Cf. Thatcher v. Tennessee Gas Transmission Co., supra; Eastern Motor Express v. United States, D.C.Ind.1952, 103 F.Supp. 694, 702, affirmed 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337; Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. When Congress occupies the field the State must withdraw therefrom.

Section 5 of the Transportation Act of 1958 amends "[t]he Interstate Commerce Act, as amended, * * * by inserting after section 13 thereof" the new Section 13a with which we are here principally concerned. It is argued that because Congress has directed that this new section be inserted to follow immediately Section 13 of the old Act, it intended that both sections should be read and construed together. More specifically, it is urged that the "authority" given to the Commission by Section 13a(1) "to enter upon an investigation of the proposed discontinuance * * * either upon complaint or upon its own initiative without complaint" must be exercised in an adversary proceeding as contemplated by 49 U.S.C.A. § 13(2), upon complaint by a State commission "in any case and as to any matter or thing concerning which a complaint is authorized to be made, to or before said commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter." 49 U.S.C.A. § 13 is entitled "Complaints to and investigations by commission." The section, however, is broken down into four subdivisions. Subdivision 1 authorizes any per-

son, corporation, body politic or municipal corporation, or any common carrier who may have a complaint "of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof" to make it to the Interstate Commerce Commission. Thereupon the Commission is required to forward a statement of the complaint to the common carrier complained against who shall be called upon either to satisfy the complaint or to answer the same in writing. If such carrier satisfies the complaint, that terminates the proceeding. If it fails to satisfy the complaint within the time specified by the Commission "or there shall appear to be any reasonable ground for investigating said complaint" the duty to investigate is imposed upon the Commission. It will be noted that the basis for complaint is limited to an act or omission of a common carrier in contravention of the provisions of the chapter. Obviously the language of this first subdivision can have no application to our presently confronting situation, since what the defendant carrier has done here is not in contravention of the provisions of the chapter as amended by the addition of Section 13a(1). Subdivision 2 of Section 13 is closely related to subdivision 1 thereof and relates to the same type of complaint and a similar basis therefor, but the maker of the complaint contemplated by subdivision 2 is "the railroad commissioner or railroad commission of any State or Territory at the request of such commissioner or commission." Subdivisions 3 and 4 are obviously equally inapplicable to the facts in the case before us. The mere juxtaposition of Section 13a(1) to Section 13 is of no significance where the language of the new section requires no construction, and where the subject matter thereof is independent of and unrelated to the former. The situations contemplated by Section 13 are entirely distinct from those contemplated by Section 13a(1). The procedure prescribed for each category of situation is therefore appropriately different. The new legislation expressly authorizes the noticing carrier to discontinue the service described in the notice "except as otherwise ordered by the Commission pursuant to this paragraph, * * *". The authority of the Commission to investigate within the thirty days' period becomes effective upon the filing of the notice of discontinuance by the carrier. There is no compulsive directive that such an investigation shall be made, although the authority to make it exists irrespective of a complaint, because it may be exercised upon the Commission's own initiative in the absence of a complaint. It is not until the Commission institutes such an investigation that it may require the carrier to continue the service "pending hearing and decision in such investigation." The Commission may require continuance or restoration of service for a maximum period of one year only when it finds "after hearing in such investigation" that the service "is required by public convenience and necessity and will not unduly burden interstate or foreign commerce." The patent difference between the situations and procedures contemplated and prescribed in old Section 13 and new Section 13a(1) eliminates any ground for a similarity of treatment.

It is further argued by plaintiffs that the similarity of the language of Section 13a(1) to that of 49 U.S.C.A. § 15(7), requires a similar construction of each section with respect to the Commission's duty to accord a hearing upon the complaint of a party adversely affected by the action in contemplation. Section 15(7) expressly confers and imposes upon the Commission the power and duty to determine the lawfulness of new rates adopted by a carrier. It provides, in pertinent part, that when a carrier files a new rate schedule with the Commission, the latter "shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate

* * *." In Kenny v. United States, D.C.N.J.1952, 103 F.Supp. 971, 977, Judge Smith of this Court construed Section 15(7) as contemplating "that the interested parties, both the carrier and protestants, shall be afforded an adequate opportunity to be heard on the merits of the controversy," i. e., whether the proposed rates were reasonable, just and lawful as the Commission elsewhere in Section 15 was authorized and directed to determine. Judge Smith further pointed out in the same case that:

> "The statute reserves to the carrier a primary right to establish tariffs but vests in the Commission the authority to determine their 'lawfulness.' * * * The burden is upon the carrier to prove not only that the proposed tariffs are 'just and reasonable' but also that they are lawful. * * * A tariff initiated by the carrier pursuant to the provisions of the Act 'must be upheld as lawful unless adequate reasons are presented for setting it aside.'" (Citing United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023.) 103 F.Supp. at page 974, supra.

The significant phrase in Section 15(7) is "to enter upon a hearing." Section 13a(1) on the other hand authorizes the Commission "to enter upon an investigation" and thereafter to hold a hearing to determine whether the ferry shall be continued in operation. The making of the investigation is left entirely to the discretion of the Commission; the holding of a hearing is required only after the institution of such an investigation.

 The due process requirements of a hearing to determine the reasonableness and lawfulness of a proposed change in carrier rates apply by reason of the involvement in such a proceeding of substantial rights or property, both of the carriers on the one hand and of their patrons on the other. The discontinuance of service by a carrier pursuant to the direct congressional authorization embodied in Section 13a(1) poses no threat to life, liberty or property. Neither the exercise of such authorization by the carrier nor the Commission's determination not to investigate the proposed discontinuance can impair the rights, under the Fifth Amendment, either of the State of New Jersey, its Board of Public Utility Commissioners, or the users of the service to be affected. State of New York v. United States, 1922, 257 U.S. 591, 42 S.Ct. 239, 66 L.Ed. 385; Addyston Pipe & Steel Co. v. United States, supra. Norwegian Nitrogen Products Co. v. United States, 1933, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796, cited by plaintiffs in this connection, is distinguishable because the requirement of a hearing in the course of the investigation prescribed by the Tariff Act of 1922 is an obviously essential protection to the property rights involved in the prescription of tariff duties to achieve an equalization of differences in costs of production in the United States and abroad. In such a situation a hearing is essential to the performance of the executive duty imposed by the Act.

 Section 13a(1) embodies a new and distinct exercise of the congressional power. Its language is clear and unambiguous and therefore neither admits of nor requires any construction by comparison with any other section or subsection of the Interstate Commerce Act, as amended.

 It may be asked what remedy, if any, is available to a party affected by a discontinuance of service under the new section if it be held that the Commission may, at its discretion, refuse to investigate such a party's complaint. There is a remedy, but it is not in this Court. It has long been recognized that the Commission may be compelled to act by a proceeding in mandamus brought in the District of Columbia, where the Commission has its theoretical domicile. Work v. United States ex rel. Rives, 1925, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561. At page 184 of 267 U.S., at page 255 of 45

S.Ct. of the last cited case, it is stated that:

"There is a class of cases in which a relator in mandamus has successfully sought to compel action by an officer who has discretion concededly conferred on him by law. The relator in such cases does not ask for a decision any particular way but only that it be made one way or the other. Such are Louisville Cement Co. v. Interstate Commerce Commission, 246 U.S. 638, 38 S.Ct. 408, 62 L.Ed. 914, and Interstate Commerce Commission v. [United States of America ex rel.] Humboldt S. S. Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849."

 We find no suggestion in the present record that the Commission acted arbitrarily or capriciously in deciding not to investigate the proposed ferry discontinuance. The Commission expressly reached its determination not to investigate the proposed discontinuance of ferry service upon "consideration of the records in Finance Docket No. 18781 (N. Y. Central R. Co. Ferry Abandonment, 295 I.C.C. 385 and 519) and Docket No. 32359 (Fares and Changes via Weehawken Ferry)". The evidence embodied in those dockets was presented in adversary proceedings before the Commission to which the plaintiffs, plaintiff-intervenors and the railroad were parties, and which extended over a period of more than two years in the course of which the issues of public convenience and necessity and effect upon interstate commerce with respect to the continued operation of the ferries were thoroughly explored. The report of the full Commission in the 1957 ferry abandonment proceedings was filed in May of that year, although this Court is not here concerned with the sufficiency of the evidence before the Commission to support its report and recommended certificate. Moreover, there has been no offer to show in this case that either the Commission or the railroad has been guilty of any violation of law or breach of duty which could cast suspicion upon the propriety of the Commission's determination to refrain from investigation of the railroad's proposed discontinuance of ferry service.

Indeed, the effort of the railroad to discontinue such service is invited by the wording of Section 13a(1) and its legislative history. Although dealing with a foreclosure of railroad property, Mr. Justice Holmes said, in Bullock v. State of Florida ex rel. Railroad Commission of State of Florida, 1921, 254 U.S. 513, at pages 520–521, 41 S.Ct. 193, at page 194, 65 L.Ed. 380:

"Apart from statute or express contract people who have put their money into a railroad are not bound to go on with it at a loss if there is no reasonable prospect of profitable operation in the future. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323. No implied contract that they will do so can be elicited from the mere fact that they have accepted a charter from the State and have been allowed to exercise the power of eminent domain. Suppose that a railroad company should find that its road was a failure, it could not make the State a party to a proceeding for leave to stop, and whether the State would proceed would be for the State to decide. The only remedy of the company would be to stop, and that it would have a right to do without the consent of the State if the facts were as supposed."

It was the same eminent Justice who wrote the Brooks-Scanlon opinion cited in the foregoing quotation.

Plaintiffs implicitly take the anomalous position in their statement that their contention accepts arguendo the railroad's position that the Interstate Commerce Commission was not required by the Constitution or by statute to grant a hearing. Such a concession destroys the foundation for the point argued. Having concluded that a hearing was not required either by the terms of the statute or under the Constitution, the denial of such a hearing could not be arbitrary or an abuse of discretion. We do not recognize

that this Court is presently called upon to determine whether the proposed ferry discontinuance finds justification in public convenience or necessity, or is in furtherance of the well-being of interstate commerce. We are confronted here by a strictly constitutional question, i. e., whether Section 13a(1) requires the Interstate Commerce Commission to hold a hearing before determining not to investigate the complaint of the plaintiff Board, and whether, in dispensing with such a hearing and concluding not to investigate, the plaintiffs' constitutional rights have been adversely affected. Whether the policy of Congress in adopting the new section is in accord with that disclosed in the Interstate Commerce Act before its amendment thereby is of no concern to a Court, and if the language of the amendment clearly authorizes the position taken by the Commission, previous congressional policy is irrelevant as a criterion of the propriety of such position.

The legislative history of the Transportation Act of 1958 indicates that it was the result of several years' consideration by the appropriate congressional committees in the fields of Transportation and Communications. The evidence presented in numerous hearings held during the period of such consideration disclosed, among other things, that the eastern railroads of the United States were in dire financial straits, due principally to continuing losses from passenger service, particularly in the commuter service. H.Rept. No. 1922, 85th Cong. 2d Sess. (1958), 1958 U.S. Code Cong. and Admin. News, p. 3220. This report explains that because discontinuance of service on a line of railroad was subject to State jurisdiction, and relief in that direction had been difficult and obstructed, the House Bill, which ultimately became the new Act, "proposed to add a new section 13a to the act, whereby the railroads, at their option, may have the Interstate Commerce Commission, rather than State commissions, pass upon the discontinuance or change in the operation or service of any train or ferry. This option is limited, however, to the operation or service of a train or ferry on a line of railroad not located wholly within a single State." Id., at page 3232.

To plaintiffs' contention that they have a legally protected interest in the ferry service which the defendant railroad seeks to discontinue, the answer is simple and brief: Any interest in such service which may have existed prior to the adoption of the Transportation Act of 1958 has been explicitly made subject to the action of a carrier authorized by Section 13a(1). The previously protected interests of the plaintiffs, if any, in the continuance of the ferry service across the Hudson River arose as a result of the State's exercise, through its Board of Public Utility Commissioners, of the authority over the ferries which existed prior to the amendment. By that amendment Congress has occupied the domain of control over such service, and thereby extinguished the jurisdiction of the plaintiff Board therein. Such congressional action not only extinguishes such Board-created rights, but also any other public rights which may have resulted from the initial grants of ferry franchises and the acceptance and user thereof by the defendant railroad and its predecessors.

With respect to the plaintiff-intervenors, although they were appropriately admitted to this litigation, their rights to the continuance of the ferry service were created by, and must be deemed to have terminated with, the jurisdiction of the plaintiff Board which concededly existed prior to the adoption of Section 13a(1). When Congress enacted Section 13a(1) the rights of the plaintiff-intervenors as well as those of the original plaintiffs became conditional licenses subject to termination through the invocation by the carrier of the procedure prescribed therein.

The temporary injunction heretofore granted in this case will be dissolved and the complaint dismissed.

McLAUGHLIN, Circuit Judge (dissenting).

The majority opinion completely sanctions the immediate abandonment of New York Central's entire public passenger ferry service between New Jersey and New York, in operation since 1883, on the basis of a single thirty day notice of discontinuance of "all ferries across the Hudson River between Weehawken, Hudson County, New Jersey and West 42nd Street and Cortlandt Street, Borough of Manhattan, City, County and State of New York."

The notice itself is defective in substance, instead of being in strict accord with its sole statutory authority of Section 13a(1) of the Interstate Commerce Act as amended (approved Aug. 12, 1958). This, without going further, is quite enough to vitiate the attempt to eliminate the public transportation involved under Section 13a(1) but because the only possible lawful construction of the above new amendment is even more important, that will be dealt with now. The invalidity of the notice will be pointed out later.

The admitted reason for the passage of the section was our decision in Board of Public Utility Commissioners of New Jersey v. United States of America, D.C. D.N.J.1957, 158 F.Supp. 98.[1] In the effort to obtain legislation which would enable this railroad or any railroad to summarily wipe out of existence any individual train or ferry or line of trains and ferries within the reach of the amendment the all pervading effect of the immediately preceding Section 13 (1) and (2) was quite apparently overlooked; in any event its authority was in nowise restricted. Section 13(1) and (2) reads:

"Complaints to and investigations by commission.—(1) Complaint to commission of violation of law by carrier; reparation; investi-

gation. Any person, firm, corporation, company, or association, or any mercantile agricultural, or manufacturing society or other organization, or any body politic or municipal organization, or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the commission to investigate the matters complained of in such manner and by such means as it shall deem proper.

"(2) Complaint by State commission; inquiry on commission's own motion. Said commission shall, in like manner and with the same authority and powers, investigate any complaint forwarded by the railroad commissioner or railroad commission of any State or Territory at the request of such commissioner or commission, and the Interstate Commerce Commis-

---

[1]. Statement to court by counsel for the New York Central Railroad Company at the hearing on the application in this suit for preliminary injunction: "I want to say to the Court * * * if you go back to the testimony before the committees, you'll find that this particular case was the reason for the enactment of this section."

sion shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made, to or before said commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter. And the said commission shall have the same powers and authority to proceed with any inquiry instituted on its motion as though it had been appealed to by complaint or petition under any of the provisions of this chapter, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had excepting orders for the payment of money. No complaint shall at any time be dismissed because of the absence of direct damage to the complainant."

No language could be more broad. When 13(1) speaks of a complainant filing a complaint to the Commission, it includes these complainants and their complaints. When it states that if the carrier does not satisfy the complaint it shall be the duty of the Commission to investigate the matters complained of, it covers the matters complained of in these complaints and it left the Commission with no alternative but to so investigate. Interstate Commerce Commission v. Baird, 1904, 194 U.S. 25, 39, 24 S.Ct. 563, 48 L.Ed. 860. And under Section 13a the Commission, irrespective of the carrier satisfying the complaint, must investigate any complaint where made by a state railroad commission as here. The Commission not only did not investigate but to the contrary, affirmatively decided "not to enter upon an investigation." And that is the hard core of the case. We are dealing, not with a rate section but with "the *general* complaint and investigation provisions of Section 13(1) and (2) * * *" as stated and emphasized by the Government and Commission in their joint brief. They cannot be eliminated. They cannot be soundly argued against. They are controlling here.

No reference is made to this palpable contretemps in the railroad brief at all. Under the circumstances that is perhaps the wisest way to handle it. The Government and the Commission first merely state that the general complaint and investigation provisions of Section 13 (1) and (2) cannot be read into the specific procedural pattern of Section 13a(1). They forget for the moment that 13(1) and (2) awards complainants basic rights, not mere steps in a cause. Then they go on to make the rather unique pronouncement that "Moreover, *notwithstanding* Interstate Commerce Commission v. Baird, 194 U.S. 25 [24 S.Ct. 563, 48 L.Ed. 860] (1904), Section 13(1) requires the Commission to investigate a complaint (1) if 'there shall appear to be any reasonable ground for investigation, and in such case,' (2) 'by such means as it shall deem proper.' Thus, even if Section 13(1) is thought to bear a relation to Section 13a(1), the Commission was required to consider in the light of the provisions and purposes of Section 13a(1) whether there was 'reasonable ground' for an investigation beyond consideration of the extensive information which it already had (i. e., investigation 'by such means as it shall deem proper'). Thus viewed, as it must be by its terms, Section 13(1) and (2) adds nothing to the Commission's admitted duty to exercise responsibly its discretionary powers under Section 13a (1)." (Emphasis supplied).

The mandatory necessity for an investigation in every case where a complaint is filed, including those covered by Section 1, under the Baird opinion has already been gone into and Section 13 (2) by its specific terms demands an investigation on every complaint filed under it.

Rounding out the chaos resulting from the determination to bar para-

graphs (1) and (2) of Section 13 from their dominating position with respect to 13a(1), two pages further on the Government and Commission brief concludes as to 13a(1): *"Moreover this particular section cannot be interpreted in a vacuum. It must be viewed against the background of the entire Act."* (Emphasis supplied). So viewed, the 13(1) and (2) investigative measures cannot be brushed aside.

The final argument of the Government and Commission on this subject, the one adopted by the majority opinion and as set out in the latter, is that " * * * the basis for complaint is limited to an act or omission of a common carrier in contravention of the provisions of the chapter. Obviously the language of this first subdivision can have no application to our presently confronting situation, since what the defendant carrier has done here is not in contravention of the provisions of the chapter as amended by the addition of Section 13a(1). Subdivision 2 of Section 13 is closely related to subdivision 1 thereof and relates to the same type of complaint and a similar basis therefor, but the maker of the complaint contemplated by subdivision 2 is 'the railroad commissioner or railroad commission. * * * The situations contemplated by Section 13 are entirely distinct from those contemplated by the new section 13a(1).' "

The above is in effect everything urged against the applicability of 13(1) and (2). Answering it, what the carrier has done is in direct contravention of the provisions of the chapter as amended because despite the addition of 13a(1), paragraphs (1) and (2) of Section 13 remain and they, by their terms, cover all situations, including that contemplated by 13a(1).

In addition to the above, it should be noted that, though forced to move hurriedly by the extraordinary time pressure of 13a(1), the complainants clearly made known their fundamental grievances to the Commission. The New Jersey state and public utility complaint is not confined to 13a(1). It

mentions preliminarily "That said notice was issued by defendant (New York Central Railroad) under the terms of the new Section 13a of the Interstate Commerce Act". It then goes on to say:

"That the Commission has previously found that there are 4,000 passengers on defendant's River Division and 3,000 local ferry passengers who use the ferry service described in II above, and that to permit the discontinuance of said ferry service without public hearing and investigation would deprive the users of the ferry service of an opportunity to be heard, and would deprive them of a service for which there is no alternative. Fairness and justice require that public hearing and investigation be held to determine the question of present and future public convenience and necessity."

It prays:

"Wherefore, complainants pray that defendant be required to answer the charges herein, and that the Commission enter an order requiring said ferry to be continued in operation or service, pending public hearing and investigation and a decision by the Commission as to whether present and future public convenience and necessity require the continuation of said ferry service, and will not unduly burden interstate commerce, and that such other and further order or orders be made as the Commission may consider proper in the premises."

And the complaint in this cause, filed within a few days thereafter (Sept. 4, 1958) by New Jersey and its Public Utility Commission, inter alia charged *"The Commission is obligated by law, particularly by 49 U.S.C.[A. §] 13(2), to investigate any complaint filed with it by the railroad regulatory agency of a state."* (Emphasis supplied).

Nor did the complaint filed with the Commission by the intervenor plaintiffs

accept 13a(1). It protested that abandonment of the ferry system was still subject to Section 1(18) of the Act which like 13(1) and (2) had not been repealed. It strongly insisted that material changes in ferry service and rates had lately occurred and needed scrutiny on the issue of public convenience and necessity. Attacking the specific method employed by the railroad under 13a(1), it stressed the invalidity of its notice and consequently the abortive character of the proceeding. It detailed a series of constitutional objections both to 13a(1) and to what had happened under the cloak of following its directives. Lastly, it prayed for an investigation and a hearing as to whether public convenience and necessity permit the discontinuance of the ferries and whether their continuance would unduly burden interstate commerce.[2]

The net result of all of the above is that Section 13 of the Interstate Commerce Act, granting reasonable protection to states and citizens against the sort of power play revealed in this litigation, still stands and still beautifully illustrates the original high purpose of the Act. Under it these plaintiffs are entitled definitely to a real investigation, and, I think, to a hearing on their charges, before these ferries are sunk without a trace.

### Defective Notice

The statute, (13a(1)), plainly never contemplated a valid notice of discontinuance of the entire New York Central Hudson River ferry service to consist of two words, "all ferries". The notice of discontinuance indicated is to cover specifically each train or ferry to be abandoned. The section speaks of proposed "discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in another State." It then refers to "such train or ferry". As used, the word "train" has its normal meaning, one transportation unit. It is not to be twisted into denoting a line of railroad. Nor is "ferry" in the text to be converted from a single vessel to the New York Central fleet of ferries. It is one of the strange features of this dispute that the Interstate Commerce Commission's own interpretation of the kind of notice required by Section 13a(1) is steadfastly ignored. *Two days after the amendment was approved, the Commission issued its rules and regulations under it and these provided that "A separate notice, shall be given in respect of each train or ferry concerning which a discontinuance or change of operation is proposed."* (Emphasis supplied). This was the necessary interpretation called for by the statutory language. Nevertheless the Commission permitted the vitally defective notice to effect the destruction of the whole public passenger Hudson River ferry system of the defendant railroad, all, according to the Commission and the railroad, without recourse.

This lack of compliance with even the scant notice provisions of 13a(1) is sufficient to reveal the ruthlessness of the effort to forthwith abandon the ferry service and more than sufficient to justify the affirmative action of this court to prevent such action, at least until a decent respect for the rights of the plaintiffs has been observed.

### Is Section 13a(1) unconstitutional?

It would seem most doubtful that the problem of unconstitutionality will

---

2. The majority opinion discourses at some length on the nonapplicability of Section 15(7) since that is directly related to rates and cites Kenny v. United States, D.C.D.N.J.1952, 103 F.Supp. 971. That section was referred to by plaintiffs as showing similarity of treatment (which it does) with the conclusion that the language of 13a(1) was probably to a large extent adapted from 15(7). A reading of the two sections tends to confirm this thought.

The fact that 13a(1) was properly inserted into the Interstate Commerce Act immediately following its parent Section 13 increases the difficulty of ignoring the presence of the general pervading law. It is one more incident illuminating the relationship 13a(1) bears to 13(1) and (2).

arise, but by reason of the dangerous endeavor to down grade this most serious question it should be briefly presented in its true light.

Because the defendant railroad was thwarted in its maneuver to close out its ferry operation under non-existent jurisdiction of the Commission, Section 13a(1) came into being. Its avowed purpose was to cut off an important public transportation artery which the New York Central originally had voluntarily sought and obtained and of which it has had exclusive possession since 1883. Under it the carrier was to be able to discard this utility, because of the claim that it was no longer profitable or for no reason and without the semblance of a hearing to the states, their components and the citizens affected. On this theory, New York, New Jersey, their counties, towns and people have no right to be heard in opposition. Substantially, it is considered perfectly proper for the railroad to have obtained these ferry franchises, operated under them in such fashion that, combined with other essential elements, i. e., changing transportation, etc., they are now alleged liabilities and thereupon, ex parte, eliminate the entire ferry system without one slight gesture of adequate substitution means of travel to the people who have become dependent on the service through the years. Currently changed conditions are the fact. Long overdue economic efficient methods, higher fares and the like have bettered the railroad's position. How much this amounts to is not to be guessed at but should not remain hidden. Ferry riders have decreased but so has the service, both in quantity and quality. As an absolute minimum the status of public passenger water surface transportation between New York City and most of the United States cries for a fair hard look before this strange, dismaying law is allowed to write an end to that transportation in peace and in war.

The deliberate deprivation of hearing could not have been motivated by fear, for the railroad protests the rightness of its attitude. It could not have been on account of some possible temporary delay arising from a hearing, for the operation is over half a century old and the Commission could pass upon the issue promptly. Apparently it was just that the railroad wanted it that way, and one thing is certain, namely, that the public was ignored in the formulation of the amendment 13a(1). I have therefore grave misgivings about the justice of the statute for the Fifth Amendment also protects states and their subdivisions and their citizens.

### Remedy

Some mention should be made of remedy because of the various confusing suggestions at the hearing.

If the Commission has been wrong in law by construing 13a(1) as some sort of sui generis authority (instead of as an integral part of the Act, which it is, and as such governed by the general all inclusive provisions of 13(1) and (2)) the injunction should be made permanent and the case sent back to the Commission to dispose of properly under 13(1) and (2). Dismissal of the suit for lack of jurisdiction, coupled with the prior thought that the plaintiffs could seek a mandamus remedy in the District of Columbia, is not at all indicated. A simple mistake of law has been made and it is up to the Commission to rectify it. The same practice would apply to a decision based on defective notice. If the matter were to be so returned to the Commission, the latter would be directed to set aside the notice which latter action would automatically end the present proceeding.